[L. A. No. 25991.   In Bank.   Nov. 16, 1961.]

J. S. SCHIRM COMPANY OF ORANGE COUNTY, Plaintiff and Appellant, v. ROLLINGWOOD HOMES COMPANY, Defendant and Respondent.

Brown & Brown and Maynard J. Brown for Plaintiff and Appellant.

Tuttle, Tuttle & Taylor and William A. Norris as Amici Curiae on behalf of Plaintiff and Appellant.

William Elliott Viney for Defendant and Respondent.

SCHAUER, J.—Plaintiff appeals from an adverse judgment in its suit to foreclose a claimed lien for materials furnished to certain houses constructed for defendant on the latter's land. For reasons which will appear we have concluded that the trial court erred in its determination that plaintiff had been paid in full for such materials, and that the judgment should be reversed.

Defendant Rollingwood Homes Company, hereinafter called Rollingwood, owner and developer of 127 lots of land (known as tract 21269) in Los Angeles County, contracted with Walter R. Sant and Sons (hereinafter sometimes called Sant or general contractor) as general contractor to construct 127 houses on such lots. To finance the construction costs defendant secured a loan from Pioneer Savings and Loan Association (hereinafter called Pioneer), under arrangements whereby Pioneer disbursed the construction funds on successive "orders" which were to be prepared by the general contractor and which would direct Pioneer to disburse varying amounts.

The general contractor and Frank Horpel, as subcontractor, entered into a subcontract whereby Horpel agreed to furnish and install wallboard in the houses. The subcontract provided that 50 per cent of the wallboard contract price for each house was payable to Horpel on completion of hanging the wallboard in the subject house and the remaining 50 per cent was payable upon completion of the wallboard installation in that house.

Between January 2, 1957, and July 1, 1957, plaintiff de-

livered building material to defendant's land for use by Horpel in performance of the subcontract. During this period the method used in making payment to Horpel and to plaintiff was as follows: Approximately each week Horpel would submit a statement to the general contractor for work completed during the preceding week. The statement would include a "first billing" (i.e., 50% of contract price) covering the initial hanging of wallboard in houses on certain lots, and a "second billing" (the remaining 50% of contract price) covering the completion of wallboard installation in houses on other lots. The information on such statement would then be used by the general contractor or by an employe of Pioneer in preparing a proposed order directing Pioneer to pay a certain amount to Horpel and plaintiff jointly. The order was prepared by writing the information in the blank spaces of a printed form, which may be described generally as follows: The blank order (of the approximate size of a bank check) is set out at the top of the form. Below the order all of the lot numbers are listed, with a blank space opposite each lot number for filling in the amount payable for labor and materials charged to that lot. This part of the form will be called the schedule. The amount payable on each of the lots covered by Horpel's weekly billing would be stated on the schedule, together with the billing total, and the order to pay would be made out in the total amount.

On the back of the form is a blank release of lien rights for material and labor furnished to the lots designated on the front of the form. After the appropriate data had been placed in the blanks of the form, Horpel obtained signatures to the proposed order and proposed release of lien rights, including the signature of plaintiff materialman. The order portion of the form was signed on a line described as "Signature of Owner," as follows: "Rollingwood Homes Co. George R. Sant." Sant was a partner in the firm which was general contractor; he was also a representative of defendant owner, Rollingwood. The signed order and release were then submitted to Pioneer, which would thereupon issue a check in the amount of the order, payable to plaintiff and Horpel jointly.

The above procedure was followed consistently from lot one through the first billing on lots 116 through 120.[1] However,

[1]The parties to this action stipulated that plaintiff had sold materials to the subcontractor, Horpel, for use on other tracts of land "upon which these same defendants were involved," and the same "pattern

neither .payment orders nor releases of lien rights were presented to Pioneer or signed by plaintiff covering a second billing on lots 116 through 120 or for either the first or second billing on lots 120 through 127, and the joint check method of payment was terminated without notice to plaintiff prior to payment for any of such billings.

On November 6, 1957, plaintiff filed a materialman's lien claim against lots 116 through 120 in the amount of $164 each, and against lots 121 through 127 in the amount of $328 each—a total of $3,116. Rollingwood recorded a bond pursuant to section 1193.2 of the Code of Civil Procedure, guaranteeing payment of any sum which plaintiff might recover on its lien claim. On January 24, 1958, plaintiff commenced this action to foreclose the lien. Rollingwood answered and cross-complained, alleging in the answer that plaintiff had been fully paid for all materials furnished by it for use on the property, and seeking by the cross-complaint to recover damages allegedly resulting from the filing of the lien.

The trial court found that plaintiff had been fully paid, by means of the checks payable to plaintiff and Horpel jointly, for all materials furnished by plaintiff for use on the property. That finding was a product of the court's conclusion that plaintiff was "required by law to apply the funds derived from said joint checks in payment of all materials furnished by plaintiff . . . before using the funds for any other purpose."

With respect to the cross-complaint, the court found that Rollingwood was damaged in the amounts it was required or had agreed to pay; i.e., the bond premium, filing fee, and $1,400 as attorney's fee. This appeal by plaintiff followed.

In support of the judgment the owner, Rollingwood, relies upon *Edwards* v. *Curry* (1957) 152 Cal.App.2d 726 [313 P.2d 613], and *Westwood Bldg. Materials Co.* v. *Valdez* (1958) 158 Cal.App.2d 107 [322 P.2d 79]. In both of those cases, as here, joint checks were issued to the subcontractor and the materialman. In neither case, however, does it appear to have been shown that the proceeds of the checks were intended by the parties to be applied in any specific manner or in pay-

---

of dealings'' had been followed, consisting of two billings for each lot, signed lien releases, payment orders directed to the lending institution, and joint checks issued to plaintiff and Horpel. The witness J. S. Schirm testified, for plaintiff, that this billing and payment procedure had been employed by the parties on two previous tracts of land and had first started in plaintiff's dealings with Horpel and Sant (general contractor, and also representative of the owner, Rollingwood) in February or March 1956.

ment for labor and materials furnished to only expressly designated lots or jobs. Thus, in the *Edwards* case the court comments (p. 730 [1a] of 152 Cal.App.2d), "From the findings and judgment roll it would be reasonable for Curry [general contractor] and the court to believe that the materialman [who requested joint checks] was interested in seeking security for the payment of its claim and if any balance remained it would remit it to the subcontractor; that when the subcontractor endorsed the checks and they were turned over to the materialman, and he placed the funds in the materialman's general account, so far as the general contractor was concerned, and *in the absence of a showing of any other agreement,* it was to that extent, a payment of and should be applied to the account of materials furnished. . . ." (Italics added.) And in *Westwood* the court points out (p. 108 of 158 Cal.App.2d) that "These joint checks bore no endorsement or notation thereon to the effect that the proceeds thereof, insofar as necessary, were to be applied by appellant [materialman] in payment of Valdez's [subcontractor] indebtedness to it, and aside from the fact that the checks were payable jointly to Valdez and appellant, respondent [owner] did not communicate to appellant his intention with respect to the application of the proceeds thereof. . . . [ P. 109 [1].] Appellant concedes that if respondent had made plain his intention that the proceeds of the checks were to be first applied to the satisfaction of Valdez's obligation for the materials furnished by appellant and used upon respondent's property, the appellant would have been under the duty to so apply such proceeds."

By contrast in the case at bench the respective payment orders, with the accompanying releases of lien claims presented to and signed by plaintiff, were, as already described herein, expressly and specifically prepared to cover only the lots designated by number thereon. Mr. J. S. Schirm, testifying as an officer of plaintiff corporation, stated that after plaintiff had signed the release of lien on the back of each payment order and the order had been delivered to Pioneer, "The next step would be that Mr. Horpel would come in after he had received the joint check, and we would negotiate the payments at that time when he came into the office"; that plaintiff retained from each check an amount for each lot covered by the billing for which the check had been issued as shown by the payment order, i.e., one-half of the cost of the

materials used on lots listed in the order;[2] that "The portion of the check that we received was applied definitely to that [Rollingwood] tract. The vouchers described exactly what it was for, and there could be no doubt as to where it had to go. In fact, right down to the lot number."[3]

Rollingwood's argument that because plaintiff was one of the two payees named in the joint checks, plaintiff was obliged

---

[2] As already stated, the subcontract provided for payment to Horpel of one-half on the first billing and one-half on the second billing for each of the designated lots.

[3] The witness J. S. Schirm further testified on this subject as follows: Plaintiff materialman maintained a "running balance" on its account with Horpel for material furnished to Horpel for use on the tract involved in this litigation, as well as on the two previous Rollingwood tracts on which the same payment procedure had been followed (see fn. 1, *ante*). Each joint check would be in payment of a billing submitted "just prior thereto" and would cover material delivered "four to five weeks" theretofore. Plaintiff determined which lots "were paid for . . . by the joint check that was received . . . , along with the voucher that had gone in, determining what lots were billed and what lots were being paid for by the contractor."

On the subject tract, when Horpel would bring in the joint checks (which had vouchers attached), "I put the checks in the bank and gave Mr. Horpel his share . . . [H]is share was a proportion because these vouchers were payment for labor and material. A certain portion was material and a certain portion was labor."

Plaintiff and Horpel "would break the payments down. . . . We had agreed to so much a lot for each building."

In addition to an amount sufficient to pay for materials for the lots shown on the respective billings, plaintiff also retained from Horpel's share of the joint checks varying amounts which were applied against Horpel's running balance with plaintiff for materials, as well as against funds plaintiff had advanced to Horpel to help meet his payrolls. Mr. Schirm testified that "Whenever Mr. Horpel came in with a joint check —or let's say at the start of a tract, we agreed upon an amount that we were going to take out of the joint check or the billings that would be at least equal to the amount of material on that tract, as far as by lot is concerned. Plus that, we were going to take an additional amount, whether it came out of his labor money or whatever. We were going to take more money than actually due on the material, but no less than what was the amount of the material on the lots. That is how a substantial portion of that [Horpel's balance owing to plaintiff] got paid. . . . [Also] when the joint check was received from Pioneer . . . we . . . refunded to Mr. Horpel a certain portion of that for his labor, less the additional sum to cover the advance that we had given him prior to that." At the time plaintiff "took these payments back and applied them to" Horpel's indebtedness to plaintiff, plaintiff had no lien for materials furnished for the particular lots (116-127) for which it filed the lien here involved, "Those materials would have been consumed in a lot at a [much] later date."

In approximately May 1957, Mr. Schirm, who had become concerned over the amount of money plaintiff had advanced to Horpel, discussed the problem with Mr. Sant (general contractor, and also representative of the owner), who, "told me, 'Mr. Schirm, you keep the material rolling. I don't want to bog down the tract, and I will keep the vouchers coming.' My fears were then quieted down that we might get stuck and not be able to get paid."

to credit the entire proceeds of such checks against not only materials delivered to the lots for which the checks were expressly issued but also against possible future deliveries not yet made or contracted for is without support in either the evidence or in law. ▉▉ As declared in *Petaluma Building Materials, Inc.* v. *Foremost Properties, Inc.* (1960) 180 Cal.App.2d 83, 86 [2] [4 Cal.Rptr. 268], which also involved application of the proceeds of joint checks, "the question of whether a check is received in payment of a debt is one of fact depending on the intention of the parties." (See also Civ. Code, § 1479; *Modesto Lumber Co.* v. *Wylde* (1933) 217 Cal. 421, 425 [2] [19 P.2d 238].) ▉ Here, the uncontradicted evidence shows that the joint checks were issued in payment of debts for labor and materials furnished to specifically listed lots, and *not* for unspecified debts which might thereafter be incurred with respect to other lots or property.

▉ Moreover, Rollingwood points to no evidence indicating that plaintiff had either the authority over Horpel or an obligation to Rollingwood to control disposition of the entire proceeds of the checks made out to plaintiff and Horpel jointly. Such checks, issued in payment of billings presented by Horpel, the subcontractor, belonged in part to him; the addition of plaintiff as a joint payee is not shown to have given plaintiff a right to withhold any greater sum from their proceeds (except as agreed to by Horpel) than was owing to plaintiff for materials furnished to the lots specified in the billings. Horpel's endorsement of the joint checks was, of course, essential before plaintiff could secure any portion of the funds whatsoever. The fact that Horpel permitted plaintiff to retain a portion of *Horpel's* share of the joint checks and apply them against Horpel's indebtedness to plaintiff for money advanced and materials previously supplied to lots and pursuant to bills other than those for which the checks were issued (see fn. 3, *ante*) would upon no theory of law of which we are aware entitle *Rollingwood* to credit against *its* obligation to plaintiff for materials *thereafter* supplied to either the same or to further and different lots. (See *Cooper* v. *Sparrow* (1953) 222 Ark. 385 [259 S.W.2d 496]; *Wells* v. *Planters Lumber Co.* (1959) 230 Ark. 570 [327 S.W.2d 1, 3-4 [4]].)

For the reasons stated the judgment is reversed.

Gibson, C. J., Traynor, J., McComb, J., Peters, J., White, J., and Dooling, J., concurred.