[Civ. No. 34170. Second Dist., Div. Three. Dec. 31, 1969.]

BOHANNAN BROS., INC., Plaintiff and Respondent, v.
LO JEAN DEVELOPMENT COMPANY et al.,
Defendants and Appellants.

## COUNSEL

Charles L. Birke and Berris & Seton for Defendants and Appellants.

Acret & Perrochet and Russell W. Culver for Plaintiff and Respondent.

## OPINION

**COBEY, Acting P. J.** — The owner, Lo Jean Development Company, and the remaining defendants, appeal from a judgment of foreclosure of a mechanic's lien of a materialman, Bohannan Bros., a corporate concrete supplier, in the principal amount of $6,814.59, against certain specified lots containing completed residences. The materialman has cross-appealed claiming that it should have had judgment enforcing its stop notice claim against the construction lender, California Federal Savings & Loan Association, and that it should have been awarded prejudgment interest. This litigation was occasioned by the partial default of the concrete sub-contractor in the payments due from it to the materialman for concrete used in the construction of these residences.

### THE APPEAL

On the appeal the sole question is whether under the circumstances of this case the materialman waived its mechanic's lien rights against these lots of the owner by generally endorsing over to its co-payee, the sub-contractor, the owner's checks without retaining any part of their proceeds. These checks bore an endorsement stamp placed thereon by the owner purporting to waive all lien rights of the endorsees for both labor and material.[1]

The trial court expressly found that the materialman had not

---

[1]This stamp reads as follows: "By endorsement, the undersigned hereby waives and relinquishes all liens and claims of liens which he has or may have as a result of materials furnished and/or labor performed under sub-contract prior to the billing attached and as to property and buildings described on said billing; and hereby certifies that there are no bills for labor or material under said sub-contract unpaid as of the date of said billing."

been paid in full. This finding, however, rests entirely upon its legal conclusion that under the authority of *Re-Bar Contractors, Inc.* v. *City of Los Angeles,* 219 Cal.App.2d 134 [32 Cal.Rptr. 607] (hear. den.) there were no facts justifying a finding of payment.

We disagree. The two cases are readily distinguishable. In *Re-Bar* the joint checks were drawn by the general contractor instead of the owner and were without any instructions as to how their proceeds should be divided between the materialman and the subcontractor. Under these circumstances the materialman and the subcontractor were privileged to divide the proceeds as they agreed, but the materialman was held estopped to claim nonpayment of that portion of the proceeds of one of the checks which it turned over to the subcontractor in violation of their agreement. (*Re-Bar Contractors, Inc.* v. *City of Los Angeles, supra,* at pp. 134-136.)

In this case during the course of the job the owner, in lieu of continuing to take lien releases from the subcontractor for materials used on the job, started stamping the quoted waiver of liens endorsement on the checks it issued to the subcontractor. These checks were made payable jointly to the subcontractor and the materialman and when issued there was attached to each a stub showing the specific work of improvement to which the check related and for which it constituted payment. Each check had also stapled to it the subcontractor's billings showing the work of improvement for which the check constituted payment.

The subcontractor, however, removed the stubs and its billings from the joint checks before presenting them to the materialman for endorsement. Instead it presented to the materialman at such times its own check together with invoices of the materialman to the subcontractor which it was paying by means of its own check. The materialman then endorsed the joint check of the owner over to the subcontractor in exchange for the subcontractor's check which, of course, was always less than the owner's check. Joint checks totaling approximately $53,500 were so endorsed by the materialman to the subcontractor.[2] This procedure was followed in spite of the fact that the balances owed the materialman by the subcontractor were constantly increasing.

We believe that the materialman was not privileged to deviate in this manner from the payment procedure set up by the owner and thereby

---

[2]The materialman did have the subcontractor endorse over to it the last two joint checks. At the trial the materialman's counsel indicated that his client was concerned only with the checks which bore the stamped endorsement. The materialman's billings to the subcontractor totaled $39,446.75; it acknowledged payment of $32,632.16. The total of the joint checks received by the materialman from the owner was $94,644.24. The materialman's credit and office manager estimated that less than half of the total of these joint checks would be for material as opposed to labor.

render nugatory the protection so provided it by the owner and to rely instead upon its lien rights against the owner notwithstanding the written waiver of such rights which it had repeatedly executed. (See *Westwood Bldg. Materials Co.* v. *Valdez,* 158 Cal.App.2d 107, 108-109, 113 [322 P.2d 79] (owner's joint checks endorsed by materialman to subcontractor, held to discharge owner's liability to materialman); *Edwards* v. *Curry,* 152 Cal.App.2d 726, 730 [313 P.2d 613], hear. den. (payment by general contractor of subcontractor and materialman by joint checks upheld against materialman though materialman diverted a part of the proceeds of the joint checks to other purposes); cf. *Savage* v. *Nee,* 212 Cal.App.2d 417, 418-421 [28 Cal Rptr. 106], hear. den. (materialman knowingly diverted owner's payments for building materials to other purposes).) It should have retained that portion of the proceeds of the joint checks which represented payments by the owner for concrete supplied by the materialman under billings of the subcontractor referred to in the endorsements.[3] This it did not do. It chose instead to endorse the joint checks of the owner to the subcontractor in return only for the subcontractor's checks.[4] The risk of underpayment of the materialman inherent in this change in payment procedure should be borne by the materialman who made the change and by no one else. (See Hunt, *Releases, Vouchers And Joint Checks In The Construction Industry* (1967) 42 L.A.BarBull. 465, 486-487; Moss, *Joint Checks In Construction Industry* (1968) 43 State Bar J. 242, 250-251.)

This is an a fortiori situation when compared to that of *Westwood,* since in that case the joint checks bore no endorsement or notation thereon to the effect that the proceeds thereof, insofar as necessary, were to be applied by the materialman in payment of the subcontractor's debt to it. (See *Westwood Bldg. Materials Co.* v. *Valdez, supra,* at p. 108.) Indeed under *Westwood* the presentation to the materialman of the early checks, those made payable jontly to it and the subcontractor without

---

[3]In so holding we do not take the position which the appellants took unsuccessfully in *Re-Bar Contractors, Inc.* v. *City of Los Angeles,* 219 Cal.App.2d 134, 135-136 [32 Cal.Rptr. 607], that the entire proceeds of the joint checks constituted payment to the materialman, or the position the owner took in *J. S. Schirm Co.* v. *Rollingwood Homes Co.,* 56 Cal.2d 789, 795 [17 Cal.Rptr. 1, 366 P.2d 444], that the materialman should have retained a portion of the proceeds of the joint checks *to cover not only the materials supplied to the specified lots, but also to cover unspecified future debts for materials thereafter used on the tract.* (See also *Rodeffer Industries, Inc.* v. *Chambers Estates, Inc.,* 263 Cal.App.2d 116, 118-119 [69 Cal.Rptr. 551].)

[4]The materialman's credit and office manager testified that the subcontractor represented to the materialman at the times it presented the joint checks for endorsement that the materials covered by the materialman's invoices which were then being paid were the same materials as those covered by the subcontractor's billings to the owner which had originally been attached to the joint checks. The materialman never checked the accuracy of this representation with the owner.

any endorsement or other notation whatsoever, constituted payment in full of the materialman in the absence of any showing of a contrary intention of the parties or that the total of the joint checks so presented was less than the materialman's total billings to the subcontractor.

### THE CROSS-APPEAL

 As indicated at the outset of this opinion, the materialman's cross-appeal raises two issues: (1) whether it should have had judgment enforcing its stop notice claim against the construction lender;[5] and (2) whether it should have been awarded prejudgment interest.

As regards the first issue, our holding on the appeal is not dispositive of this issue. Stop notice rights are independent of and cumulative to lien rights. (*A-1 Door & Materials Co.* v. *Fresno Guar. Sav. & Loan Assn.,* 61 Cal.2d 728, 732 [40 Cal.Rptr. 85, 394 P.2d 829].) Our holding on the appeal rests, at least partially, upon a waiver of lien rights; it is not based exclusively on a rationale of full payment of the materialman. (Cf. *Keenan Pipe & Supply Co.* v. *Shields* (9th Cir. 1956) 241 F. 2d 486, 488-490; *Ferry* v. *Ohio Farmers Ins. Co.,* 211 Cal.App.2d 651, 655 [27 Cal.Rptr. 471], hear. den.)

Counsel agree that the only reason the materialman was denied judgment enforcing its stop notice claim was because the trial court concluded that under Code of Civil Procedure section 1197.1, subdivision (a), the materialman had filed its enforcement action prematurely. The materialman attacks the soundness of this reason because on October 4, 1965, when it filed the instant suit to foreclose its mechanic's lien and to enforce its stop notice claim, among other things, this subsection read in relevant part: "No action to enforce the payment of any [stop notice] claim . . . shall be commenced against *the owner* . . . prior to the expiration of the period within which claims of lien must be filed for record. . . ." (Italics added.) The materialman asserts that this subsection must be read strictly and literally and that the protection it provided against the premature commencement of an action to enforce a stop notice claim applied only in favor of the owner and not in favor of a construction lender. In support of this interpretation the materialman points out that this subsection has since been amended (Stats. 1967, ch. 542, pp. 1890-91) by adding the following words, "nor against any of the parties described

---

[5]The trial court concluded that the materialman was entitled to judgment enforcing its stop notice claim against the construction lender, but no such judgment was entered. The court's minute order, on the other hand, directs judgment for the defendant on the stop notice cause of action against the construction lender. At oral argument counsel agreed that this conclusion of law was clerically erroneous and that the trial court had intended to conclude directly to the contrary as it did with respect to the enforcement of the materialman's stop notice claim against the owner.

in subdivision (h) of Section 1190.1." In short, the materialman's position is that until November 8, 1967, the only class of potential defendants protected against premature suits to enforce stop notice claims were owners and not those against whom claims had been filed pursuant to section 1190.1, subdivision (h).

We disagree. It is true that what was explicitly barred by the subsection prior to November 8, 1967, was only suits to enforce stop notice claims against owners. But the suit at bench is such a suit. It is, among other things, an action to enforce stop notice claims against both the owner and the construction lender. Consequently, read strictly and literally, the subsection as it existed in 1965 barred this action as premature.

Furthermore, the construction of this subsection urged by the materialman is contrary to the construction impliedly placed upon it by both the courts and the commentators.[6] In *Miller* v. *Mountain View Sav. & L. Assn.,* 238 Cal.App.2d 644, 653-654 [48 Cal.Rptr. 278] (hear. den.) decided in 1965 and likewise involving a single suit against both an owner and a construction lender, the court in dictum[7] ruled that under this subsection the suit was barred against the construction lender. In *A-1 Door & Materials Co.* v. *Fresno Guar. Sav. & Loan Assn., supra,* 61 Cal.2d 728, 736-737, a suit by a materialman against a construction lender alone, our Supreme Court held that the construction lender was obligated by this subsection to withhold funds from stop notice claimants until the period for the recordation of claims of lien had run. This holding is plainly inconsistent with the construction of the subsection which the materialman would have us adopt in this case.

The statutory requirement that a suit may not be brought to enforce a stop notice claim before the expiration of the period within which such claims may be filed (see Code Civ. Proc., § 1190.1, subdivision (h)) is not a mere procedural technicality. (Cf. *Sunlight Elec. Supply Co.* v. *McKee,* .226 Cal.App.2d 47, 50-51 [37 Cal.Rptr. 782], hear. den.) It prohibits the commencement of stop notice litigation until those holding

---

[6]In Appendix B to the comment, *California Mechanic's Liens* (1963) 51 Cal.L.Rev. 331, 385, the prohibition against premature suits is stated generally without limiting it only to suits against owners. A statement to the same effect appears in Hunt, *The Stop Notice Remedy in California* (1962) 38 L.A.BarBull. 16, 17, and in Burden, *Stop Notices And Equitable Liens* (1967) 1 U.S.F.L.Rev. 225, 231.

[7]This ruling was dictum because the court subsequently held that this defect had been waived by the construction lender since it had not filed a demurrer upon this ground or raised this defense otherwise by a plea in abatement in its answer. (*Miller* v. *Mountain View Sav. & L. Assn.* at pp. 654-655.) In this case no such waiver occurred. The defect was raised as a specific affirmative defense in favor of the construction lender.

construction funds are in a position to know the total of such claims. At this point in time enforcement litigation may either prove to be unnecessary or may be substantially more limited in nature.

Moreover, holding that all stop notice enforcement actions, regardless of the identity of the defendant, were barred until the filing period for such claims has expired is consistent with the remainder of section 1197.1. This section provides in subsections (b), (c), and (d) thereof, that notice of the action must be given to the same persons and in the same manner as is required with respect to notices of claim, that any number of claimants may be joined in the same action and that such actions may be consolidated, and that upon demand of the owner the court shall require that all claimants to the moneys withheld by the owner in response to such notices be impleaded in the action "to the end that the respective rights of all parties may be adjudicated and settled therein." (See *A-1 Door & Materials Co.* v. *Fresno Guar. Sav. & Loan Assn., supra,* 61 Cal.2d 728, 736, fn. 3; *Rossman Mill & Lbr. Co.* v. *Fullerton Sav. & L. Assn.,* 221 Cal.App.2d 705, 711-712 [34 Cal.Rptr. 644], hear. den.) In addition, the construction lender who pays any stop notice claimant prior to this point in time does so at his peril. (See *Idaco Lumber Co.* v. *Northwestern S. & L. Assn.,* 265 Cal.App.2d 490, 495-498 [71 Cal.Rptr. 422], hear. den.)

Finally, we note that the bill embodying the 1967 amendment making explicit what all had regarded as implicit previously was passed on the consent calendar in both houses of the Legislature. (1967 Final Calendar of Legislative Business, AB 599, p. 225.) A bill normally is placed and remains on the consent calendar only if it is either completely noncontroversial or makes no significant change in the law. (See Joint Rules California Legislature 1967, Regular Session 22.1, 22.2, 22.3.) This latter interpretation would appear to be justified here as the bill in question was apparently recommended by Resolution No. 48 of the 1966 Conference of State Bar Delegates and this resolution in effect sought condification of the aforementioned decisional law of the *A-1 Door* and *Miller* cases. (See 42 State Bar J. 206.)

In view of the foregoing there is no need to discuss the second issue raised by the materialman on its cross-appeal, namely, the matter of prejudgment interest.

The judgment of foreclosure of the materialman's mechanic's lien is

reversed. Appellants and cross-respondents are awarded their costs both on the appeal and the cross-appeal.

Schweitzer, J., and Allport, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied February 25, 1970. Peters, J., and Mosk, J., were of the opinion that the petition should be granted.