774 P.2d 1372

**BROWN WHOLESALE ELECTRIC COMPANY, a California corporation, Plaintiff–Appellee,**

v.

**BEZTAK OF SCOTTSDALE, INC., an Arizona corporation, in its capacity as General Partner of Beztak Scottsdale Ranch Limited Partnership; a Michigan limited partnership; Beztak Scottsdale Ranch Limited Partnership, Defendants–Appellants.**

No. 1 CA–CIV 9835.

Court of Appeals of Arizona, Division 1, Department A.

Feb. 9, 1989.

Review Granted in Part and Denied in Part July 11, 1989.*

---

* Corcoran, J., of the Supreme Court, was not present and did not participate in the determination of this matter.

Strong and Pugh, P.A. by William K. Strong, Phoenix, for plaintiff-appellee.

Jennings, Kepner & Haug by Donald W. Hart, Chad L. Schexnayder, Phoenix, for defendants-appellants.

## OPINION

HAIRE, Presiding Judge.

The primary issue presented on this appeal is as follows. When a general contractor makes a subcontractor and materialman joint payees on a check for labor and materials furnished, and there is no agreement between the materialman and general contractor as to the allocation of proceeds, will the materialman, by endorsing the check, be deemed to have been paid the money due him up to the amount of the joint check?

## FACTS

Beztak Scottsdale Ranch Limited Partnership is the owner of an apartment project in Scottsdale, Arizona. Beztak of Scottsdale is the general partner of the limited partnership. These entities will be referred to jointly as "the owner." Beztak of Arizona is an affiliated company and the general contractor on the project ("the general contractor"). The general contractor entered into a contract with High Sierra Electric ("the subcontractor") in which the subcontractor agreed to furnish all necessary material, labor, tools, equipment and supplies to complete the electrical wiring on the project. The subcontractor purchased some of its supplies from Brown Wholesale Electric Company ("the materialman").

Section 3 of the contract between the general contractor and the subcontractor provided that the general contractor would pay the subcontractor on a monthly basis for all labor and installed materials under a progress schedule, less a ten percent retention. Section 7 of the contract provided that the general contractor had the right to make any payment due to the subcontractor by joint check to the subcontractor and to anyone to whom the subcontractor was indebted for labor or materials. The subcontractor requested that the general contractor issue the payment checks to it and the materialman jointly.

The general contractor issued three checks jointly to the subcontractor and the materialman. The general contractor did not tell the materialman how much of each joint check the materialman should retain. The materialman endorsed each joint check and the subcontractor then issued its check to the materialman in a lesser amount. The first joint check was for $11,123.10, of which the materialman received $6,673.86. The second joint check was for $22,124.57, of which the materialman received $13,-274.74. The final joint check was for $21,-306.66, of which the materialman received $12,784.00. Each of the amounts received by the materialman represents 60% of the total joint check. At the time each joint check was endorsed by the materialman, the subcontractor's account with the materialman for this project was in arrears in excess of the amount of the joint check.

The subcontractor eventually defaulted on the contract and was replaced before the project was completed. After the subcontractor's default, the materialman filed a lien against the project, and sued the owner to foreclose the lien. The owner moved for partial summary judgment based on the joint check rule. The owner argued that the materialman was paid a total of $54,554.33 by means of the joint checks, and that the materialman's lien must be reduced by that amount. The materialman argued that only the amount it actually received from the subcontractor, $32,732.60, should be credited to the account. The amount in dispute in this action is $21,821.73.[1]

The trial court denied the owner's motion for summary judgment. The court concluded that the joint check rule applies only in the absence of a contrary agreement, and that here there was evidence of a contrary agreement. The court's conclusion was based on the provision in the contract between the general contractor and the subcontractor relating to progress payments. From the progress payment provi-

sion, the court found an intent that the materialman would receive from the proceeds of each joint check 90% of the cost of installed materials where sufficient progress had been made to satisfy a condition of payment. Because the materialman received more than that amount from each joint check, the trial court denied the owner's motion for summary judgment and entered judgment in favor of the materialman. The owner has appealed from that judgment.

## THE JOINT CHECK RULE IN ARIZONA

Arizona courts have not directly addressed the joint check rule. We have recognized that, as a general practice, general contractors issue joint checks to protect themselves from material suppliers' lien claims. *See, e.g., Wells–Stewart Constr. Co. v. Martin Marietta Corp.*, 103 Ariz. 375, 380, 442 P.2d 119, 124 (1968); *Ray Elec. Inc. v. Merchants Bonding Co.*, 157 Ariz. 374, 758 P.2d 149 (App.1988); *cf. United Bank v. Mesa N.O. Nelson Co.*, 121 Ariz. 438, 442, 590 P.2d 1384, 1388 (1979).

■ The joint check rule provides that, in the absence of an agreement to the contrary, if a material supplier receives a joint check and endorses it without collecting from the proceeds the amount of the debt then owed by the subcontractor, the material supplier is not entitled to assert a mechanic's lien or payment bond claim based on that debt. *Post Bros. Constr. Co. v. Yoder*, 20 Cal.3d 1, 141 Cal.Rptr. 28, 569 P.2d 133 (1977). The material supplier need not retain any amount which is not then due. *Medford School District v. Peterson & Jones Commercial Construction*, 76 Or.App. 99, 708 P.2d 623 (1985).

The joint check rule has been approved by each state that has addressed this issue. *See, e.g., Medford v. Peterson*, 76 Or.App. 99, 708 P.2d 623 (1985); *Anchor Concrete Co. v. Victor Sav. & Loan*, 664 P.2d 396

---

1. The three joint checks discussed above are in dispute here. A fourth check was issued but the owner is not claiming that the materialman should be held to have received the full amount of the check because at the time the check was endorsed the subcontractor's account with the materialman was not in arrears and the amount that the materialman received brought the account current.

(Okla.1983); *Post Bros. v. Yoder*, 20 Cal.3d 1, 141 Cal.Rptr. 28, 569 P.2d 133 (1977).[2] The reasoning behind the rule varies from state to state. Some courts have held that by endorsing the joint check, the material supplier has received full payment of that amount as a matter of law. *Post*, 141 Cal.Rptr. at 30, 569 P.2d at 135. Other states explain the joint check rule by finding that endorsement of the check signifies the material supplier's release of the payor from liability for that amount. *F & C Engineering Co. v. Moore*, 300 S.W.2d 323 (Tex.Civ.App.1957) (creditor who advances money to subcontractor from joint check proceeds is not entitled to lien protection. Endorsement releases general contractor and surety from liability on amount of joint check.) Similarly, in some states the endorsement signifies a waiver on the part of the co-payee of his right to foreclose on a lien. *Anchor Concrete Co. v. Victor Sav. & Loan Ass'n*, 664 P.2d 396 (Okla.1983) (when subcontractor received and endorsed joint check and did not pay itself the total due, subcontractor is deemed to have been paid in full and to have waived the right to recover by foreclosure on lien against property owner). Finally, some courts have applied the joint check rule on the basis of estoppel. These courts explain that the material supplier, whose conduct has rendered the injury possible, is estopped from imposing the loss on the general contractor. *See Starkey Constr., Inc. v. Elcon, Inc.*, 248 Ark. 958, 457 S.W.2d 509 (1970); *City Lumber Co. v. National Surety Corp.*, 229 S.C. 115, 92 S.E.2d 128, 131 (1956).

Despite these different legal theories, we discern one explanation common to the decisions. A material supplier should understand that one of the purposes of a joint check arrangement is to protect the general contractor, its surety and the owner from the material supplier's claims. Joint checks are used to protect the materialman, by ensuring payment, and to protect the owner by eliminating potential lien claims against the property. The owner should not have to pay the same debt twice. If the material supplier decides to jeopardize this protection by endorsing a joint check without retaining sufficient proceeds to satisfy the subcontractor's debt, then the material supplier should bear the risk of its own decision. As explained by one commentator in the context of a payment bond claim, the material supplier is gambling with the surety's money:

> "There are number of reasons why the creditor [materialman] may elect to release those funds to the debtor [subcontractor] and leave the debt unsatisfied. The debtor may be cash poor, or the creditor may simply wish to maintain good relations with its customer by continuing to advance credit. To the extent that it does so, however, the creditor is literally gambling with the surety's money. The surety has no way to influence what is essentially a purely business decision conducted at arm's length between two remote parties, and should not suffer because the creditor's decision turns out to be the wrong choice."

Barrett, *Joint Check Arrangements: A Release for the General Contractor and Its Surety*, 8 The Construction Lawyer 7, 37 (1988).

We have reviewed the pertinent cases and the issues presented in this appeal, and we adopt the joint check rule as the law in Arizona. We base this conclusion on other state court decisions, on our own case law recognition of the joint check practice in Arizona, and on the well established principle recognized in Arizona that where one of two innocent parties must suffer, the loss should fall on the one whose acts have caused the loss. *In the Matter of the Estate of Milliman*, 101 Ariz. 54, 415 P.2d 877 (1966).

**2.** *See also Iowa Supply Co. v. Grooms & Co.*, 428 N.W.2d 662 (Iowa 1988); *Glidden Coatings and Resins v. Suitt Const. Co. Inc.*, 290 S.C. 240, 349 S.E.2d 89 (S.C.App.1986); *Tropical Supply Co. Inc. v. Verchio*, 402 So.2d 1284 (Fla.App.1981); *Starkey Constr. Inc. v. Elcon, Inc.*, 248 Ark. 958, 457 S.W.2d 509 (1970); *Hero & Co. v. Farnsworth & Chambers Co.*, 236 La. 306, 107 So.2d 650 (1958); *F & C Engineering Co. v. Moore*, 300 S.W.2d 323 (Tex.Civ.App.1957); *Southwest Hardware & Lumber Co. v. Borgerson*, 77 S.W.2d 195 (Mo.App.1934).

We recognize that federal courts are reluctant to apply the joint check rule to material suppliers under the Miller Act, 40 U.S.C. 270(a)–(f) (1982). *United States ex rel. Pomona Tile Mfg. Co. v. Kelley*, 456 F.2d 148 (9th Cir.1972). We distinguish these decisions, noting their concern that the Miller Act be liberally construed to protect material suppliers in public projects. *See Clifford E. MacEvoy Co. v. United States*, 322 U.S. 102, 107, 64 S.Ct. 890, 893, 88 L.Ed. 1163, 1167 (1944).

## APPLICATION OF THE JOINT CHECK RULE IN THIS CASE

■ We now must determine whether the application of the joint check rule to the facts of this case requires reversal of the judgment entered by the trial court. The issue we address is, was there an agreement between the general contractor and the materialman regarding allocation of the joint check proceeds? The trial court found that there was such an agreement. We disagree.

The materialman correctly notes that the joint check rule is a rule of presumed intent, applying only if there is no agreement or actual intent regarding allocation of the joint check proceeds. From this premise, the materialman contends that the facts in this case reveal that the general contractor intended that the materialman receive from each check 90% of the cost of those materials where sufficient progress had been made to trigger the subcontractor's entitlement to the progress payment represented by the joint check. The materialman notes that the general contractor's invoices and deposition testimony indicate that the joint check amounts represented 90% of the labor cost during the month and 90% of the cost of those installed materials. The materialman reasons that the owner remains liable for the unpaid debt because it intended that the materialman retain only a portion of each check rather than bring its account current.

There is no dispute as to how the progress payments were determined. The contract provided the method for calculating the amount of each check. We do not believe that this indicates an agreement between the general contractor and the materialman regarding allocation of the proceeds. The contract did not specify how the subcontractor should allocate the proceeds, nor does the method of calculation indicate an intent on the part of the general contractor to instruct the subcontractor and the materialman regarding allocation.

Including the materialman as a co-payee on a joint check makes clear the general contractor's intent to discharge obligations owed to the materialman so as to preclude the assertion by the materialman of a lien against the project. As noted, this rule gives way to an express or implied agreement between the maker and payee/materialman. *Post*, 141 Cal.Rptr. at 30, 569 P.2d at 136. The materialman has not proven the existence of any express or implied agreement here. The materialman admits that it received no instructions from the general contractor. The materialman presented no evidence of an allocation agreement between the general contractor and the payees, nor any evidence that the general contractor intended that the materialman be paid only for the installed material.

The materialman also argues that economic realities must be considered. The contention is made that the full amount owed from each check could not be kept because that might cause the subcontractor to default on its own obligations. The materialman cannot claim that it was watching out for the subcontractor's interests, and then demand that the general contractor or owner foot the bill. The materialman, if concerned about the subcontractor's potential default, should have communicated that concern to the general contractor or owner. They would have been warned of the problem and perhaps could have made arrangements to rectify it. The onus is on the materialman to either use the proceeds of the joint check to bring its account current or to communicate to the maker of the check any problems that arise. If the materialman chooses to make its independent decisions regarding alloca-

tion of the proceeds, it must bear the risk of that decision.

## CONCLUSION

For the reasons discussed above, we reverse the judgment entered by the trial court and remand this matter with directions to hold in favor of the owner on the joint check issue.

SHELLEY, J., and DAVIS J. Pro Tem., concur.

*Note:* The Honorable RICHARD M. DAVIS was authorized to participate in this case by the Chief Justice of the Arizona Supreme Court pursuant to Ariz. Const. art. VI, § 31.