788 P.2d 73

**BROWN WHOLESALE ELECTRIC COMPANY, a California corporation, Plaintiff–Appellee,**

v.

**BEZTAK OF SCOTTSDALE, INC., an Arizona corporation, in its capacity as General Partner of Beztak Scottsdale Ranch Limited Partnership, a Michigan limited partnership; Beztak Scottsdale Ranch Limited Partnership, Defendants–Appellants.**

No. CV–89–0178–PR.

Supreme Court of Arizona, En Banc.

Feb. 5, 1990.

Strong and Pugh, P.A. by William K. Strong, Phoenix, for plaintiff-appellee.

Jennings, Kepner & Haug by Donald W. Hart and Chad L. Schexnayder, Phoenix, for defendants-appellants.

CORCORAN, Justice.

Plaintiff–Appellee Brown Wholesale Electric Company (Brown) seeks review of the court of appeals' reversal of the trial court's grant of summary judgment in its favor. We granted review to consider the applicability and effect of the joint check rule in materialmen's lien cases. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), and A.R.S. § 12–120.24.

## FACTS AND PROCEDURAL HISTORY

Brown brought this action to foreclose a mechanics' and materialmen's lien. Brown is an electrical supply company that provided materials for use in the construction of the La Privada apartment project at Scottsdale Ranch. Defendant–Appellant Beztak of Scottsdale, Inc. (Beztak) is the general partner of Beztak Scottsdale Ranch Limited Partnership, owner of the real property where the project is located. Beztak engaged Beztak of Arizona, Inc. (BOA), an affiliated company, as general contractor.

Brown supplied materials pursuant to a subcontract with High Sierra Electric, the electrical subcontractor on the La Privada project. High Sierra commenced performance in late 1984, and Brown first delivered materials on February 13, 1985. The BOA/High Sierra subcontract provided for payments to be made pursuant to a progress schedule. The project consisted of 38 buildings, and the work to be done by High Sierra on each building was divided into 3 phases, namely, underground, rough-in, and finish. A payment schedule in the BOA/High Sierra contract listed the price to be paid for each phase of electrical work on each building. These figures totalled $550,000.00, the subcontract price. BOA was to make monthly progress payments to High Sierra. To obtain payment, High Sierra submitted invoices to BOA covering particular buildings on which it had completed either underground, rough-in, or finish. No payment was required for work that fell short of these specified progress levels. The invoices from High Sierra to BOA included within the total amount a figure for the materials purchased by High Sierra from Brown. BOA deducted a 10% retention from the amount due High Sierra pursuant to their contractual arrangement.

High Sierra subsequently requested that BOA make its progress payments by check payable jointly to High Sierra and its materialman, Brown Wholesale. BOA complied with this request. The joint checks issued by BOA to High Sierra and Brown at issue in this case are:

| Date | Amount | Materials | Retained by Brown |
|------|--------|-----------|-------------------|
| 3/22/85 | $11,123.10 | $4,667.56 | $ 6,673.86 |
| 4/17/85 | 22,124.57 | 7,775.00 | 13,274.74 |
| 5/20/85 | 21,306.66 | 3,254.80 | 12,784.00 |
| | | 7,109.10 | |
| Totals | $54,554.33 | $22,806.46 | $32,732.60 |

The figure listed for materials represents the invoice amount, and does not reflect the 10% deduction for retention. As can be seen, the portion of each joint check retained by Brown exceeded the figure for materials that High Sierra included in its invoice to BOA. The summary judgment record does not show how Brown calculated the amounts retained. However, at the time Brown endorsed each joint check, High Sierra's account with Brown was in arrears in excess of the amount of the joint check.

In June 1985, BOA terminated the High Sierra subcontract due to inadequate performance. At that time, High Sierra had only completed 10%–15% of the La Privada contract. BOA withheld the final monthly progress payment requested by High Sierra, in the amount of $14,168.16, of which $5,509.84 was designated as payment for materials. High Sierra subsequently filed a petition in bankruptcy.

Brown brought this action in superior court against Beztak to foreclose its materialmen's lien. Brown sought compensation for electrical supplies furnished to High Sierra before its default. The amount of Brown's claim has been reduced substantially since the filing of this action and now approximates $59,522.88.

On cross motions for summary judgment, the trial court entered judgment in favor of Brown Wholesale, rejecting Beztak's contention that it should prevail based on the joint check rule in materialmen's lien cases. Beztak argued that Brown should have retained funds from each joint check sufficient to satisfy the entire amount then due from High Sierra for materials supplied to the La Privada project. Because it allowed High Sierra to retain a portion of these funds, Beztak argued, Brown's lien for any amount due at the time of endorsement of each joint check should be reduced up to the amount of the check. The High Sierra account was in arrears in excess of the amount of each joint check at the time of each endorsement; therefore, the joint check rule required Brown to retain the entire proceeds, according to Beztak. The checks totalled $54,554.33, of which Brown retained only $32,732.60. Beztak thus contended that the joint check rule should reduce the lien by $21,821.73—the difference between the two figures.

The trial court rejected the joint check defense based on provisions in the BOA/High Sierra subcontract that governed the calculation of progress payments. The court interpreted these provisions as constituting an agreement between the parties concerning allocation of the proceeds of the joint checks, rendering the defense inapplicable. The court noted that the invoices High Sierra submitted to BOA contained a specified amount requested for materials. BOA intended to pay these amounts, less the 10% retention, for materials already incorporated in buildings that had reached a particular progress goal. The court found that BOA's intent supplied the agreement necessary to take the case out of the general rule.

Beztak appealed from summary judgment in favor of Brown. The court of appeals reversed and remanded the case with directions that the trial court hold in favor of Beztak on the joint check issue. *See Brown Wholesale Elec. Co. v. Beztak of Scottsdale, Inc.*, 160 Ariz. 582, 774 P.2d 1372 (App.1989). The court of appeals recognized that the joint check rule had not been addressed by prior Arizona case law, although it has been adopted in various other states. The court approved the doctrine, noting that "[t]he owner should not

have to pay the same debt twice." *Brown Wholesale*, 160 Ariz. at 585, 774 P.2d at 1375. The court of appeals found that no agreement existed governing allocation of the proceeds of the joint checks, and absent such an agreement, Brown's failure to retain the entire amount of each check reduced its lien by $21,821.73—the amount in controversy in this case. We granted review to examine the application of the joint check rule, an issue of first impression in Arizona.

### Issue Presented

Did the court of appeals err in remanding the case with instructions to enter judgment for Beztak based on the joint check rule in materialmen's lien cases?

### DISCUSSION

#### 1. *The joint check rule*

Beztak urges this court to adopt the joint check rule as the law of Arizona. The rule was articulated by the California Supreme Court, which restated the doctrine: "When a subcontractor and his materialman are joint payees, and no agreement exists with the owner or general contractor as to allocation of proceeds, the materialman by endorsing the check will be deemed to have received the money due him." *Post Bros. Constr. Co. v. Yoder*, 20 Cal.3d 1, 3, 141 Cal.Rptr. 28, 30, 569 P.2d 133, 135 (1977).

The joint check rule reflects a widespread practice in the construction industry that allows owners and general contractors to protect themselves from lien foreclosure by materialmen whom subcontractors have failed to pay. The issuance of a check payable jointly to the subcontractor and the materialman enables the materialman to withhold endorsement until he is assured that the subcontractor's account with him is or will be satisfied from the proceeds of the check. This may be accomplished in various ways, including the use of gentlemen's agreements or more formal escrow arrangements. The practice of issuing joint checks protects both the owner/general contractor and the materialman, because each has an interest in ensuring that the materialman is paid. *See generally* Bar-

rett, *Joint Check Arrangements: A Release for the General Contractor and Its Surety*, 8 Constr.Law. 7 (1988) (evolution of joint check rule).

Each state court considering the issue has adopted the joint check rule. *See, e.g., Post Bros.*, 20 Cal.3d at 3, 141 Cal.Rptr. at 30, 569 P.2d at 135; *Iowa Supply Co. v. Grooms & Co. Constr., Inc.*, 428 N.W.2d 662, 666 (Iowa 1988); *Anchor Concrete Co. v. Victor Sav. & Loan Ass'n*, 664 P.2d 396, 399 (Okla.1983); *Medford School Dist. ex rel. North Coast Elec. Co. v. Peterson & Jones Commercial Constr., Inc.*, 76 Or. App. 99, 103–04, 708 P.2d 623, 626 (1985); *City Lumber Co. v. National Surety Corp.*, 229 S.C. 115, 120–21, 92 S.E.2d 128, 131 (1956); *F. & C. Eng'g Co. v. Moore*, 300 S.W.2d 323, 326–27 (Tex.Civ.App.1957); *Dauphin v. Smith*, 42 Wash.App. 491, 496–97, 713 P.2d 116, 120 (1986) (dicta).

We join these courts in holding that when an owner or general contractor makes a materialman and a subcontractor joint payees on a check that includes payment for labor and materials furnished, and no other agreement exists between the materialman and the owner or general contractor as to allocation of the proceeds, the materialman, by endorsing the check, will be deemed to have been paid the money due him, up to the amount of the joint check.

Brown urges this court not to adopt the joint check defense, citing various federal cases governed by the Miller Act, 40 U.S. C.A. § 270b. Generally, federal courts have rejected the joint check rule in Miller Act cases, based on "the congressional intent to protect those whose labor and materials go into public projects." *Clifford F. MacEvoy Co. v. United States*, 322 U.S. 102, 107, 64 S.Ct. 890, 893, 88 L.Ed. 1163 (1944); *see, e.g., United States ex rel. Clark–Fontana Paint Co. v. Glassman Constr. Co.*, 397 F.2d 8, 11 n. 2 (4th Cir. 1968) (distinguishing cases involving materialmen's liens created by state law). State courts, however, uniformly have declined to apply Miller Act precedent to cases involving materialmen's liens, finding these deci-

sions unpersuasive. *See, e.g., Iowa Supply*, 428 N.W.2d at 666. We join these courts in holding that the court of appeals was correct in rejecting Brown's argument based on the Miller Act cases.

### 2. *Application of the joint check rule*

The joint check rule has been often enunciated, but rarely applied to specific facts. The situation presented in this case has not been addressed by any of the courts that have adopted the doctrine. We address the legal issues, but hold that both the court of appeals and the trial court erred in permitting resolution by summary judgment. The record in this case provides an insufficient factual basis to hold, as a matter of law, that the joint check rule applies to Brown's claim.

■ In order to protect the general contractor from having to pay more than the amount he owes the subcontractor, the joint check rule creates a presumption that on endorsing the joint check, the subcontractor's materialman has received all sums then owed to him, even though he actually may have received only part or none of the amounts owed him. The purpose of the rule, however, is to protect the general contractor from having to pay twice, not to enable him to avoid paying once. Thus, to the extent there are any sums still owing from the general contractor on the particular subcontract in question, the joint check rule is inapplicable and the materialman, if he is unpaid, may to that extent pursue his lien claim. Because the record does not indicate the amount, if any, still owing from the general contractor to the subcontractor, on remand the trial court must also determine this issue.

■ Next, the trial court must apply the joint check rule to amounts claimed by Brown that exceed the amount still owed to High Sierra on this subcontract. At the time Brown endorsed each joint check, the balance owed to it by High Sierra was in excess of the check amount. Therefore, absent an agreement on allocation of the proceeds, Brown's lien should be reduced by the full amount of the joint checks, rather than the amount actually retained by Brown. The latter amount having been previously credited, application of the doctrine would further reduce Brown's lien by $21,821.73.

### 3. *Agreement as to allocation of proceeds of joint checks*

Brown argues, and the trial court held, that the provisions of the BOA/High Sierra subcontract constitute an agreement as to allocation of the proceeds of the joint checks. BOA concededly intended to pay only for work performed on individual buildings on which a specified level of progress was attained. BOA was informed by High Sierra as to the portion of the sum requested that represented payment for materials. Therefore, records maintained by both BOA and High Sierra indicate the amount of each progress payment intended as reimbursement for materials used in the specific building the check covered. Brown contends that it was only required to retain this amount, rather than all debts owing from High Sierra on the La Privada project.

The Supreme Court of California has considered the joint check rule as applied to progress payments covering specified lots. *See J.S. Schirm Co. v. Rollingwood Homes Co.*, 56 Cal.2d 789, 17 Cal.Rptr. 1, 366 P.2d 444 (1961). In *Rollingwood*, plaintiff materialman supplied wallboard used in the construction of 127 houses on individual lots. The general contractor and subcontractor agreed to a progress payment schedule whereby 50% of the wallboard contract price per house was to be paid upon completion of hanging the wallboard, the remainder payable upon completion of wallboard installation. The subcontractor applied for progress payments in a manner similar to that established by High Sierra and BOA, except that the materialman received a copy of the payment order along with the joint check. The order, prepared by the general contractor, included data furnished by the subcontractor, such as the lot number the check covered and the total amount requested for labor and materials. It is unclear whether the portion of the payment allocated to materials was specified. Subsequently, the general contractor ceased making payments by joint check without notifying the material-

man. *See Rollingwood,* 17 Cal.Rptr. at 1–2, 366 P.2d at 444–45.

The materialman later sued to foreclose its lien arising from wallboard furnished to lots other than those covered by the joint checks. Many of these debts were not due at the time the materialman endorsed the joint checks. The California Supreme Court held:

> Rollingwood's argument that because plaintiff was one of the two payees named in the joint checks, plaintiff was obliged to credit the entire proceeds of such checks against not only materials delivered to the lots for which the checks were expressly issued but also against possible future deliveries not yet made or contracted for is without support in either the evidence or in law.

*Rollingwood,* 17 Cal.Rptr. at 4, 366 P.2d at 447.

Beztak correctly notes that *Rollingwood* apparently involved amounts not yet due at the time the materialman endorsed the joint check. Therefore, it argues, the joint check rule is inapplicable. However, the California Supreme Court continued, noting:

> [C]hecks, issued in payment of billings presented by ... the subcontractor, belonged in part to him; the addition of plaintiff as a joint payee is not shown to have given plaintiff a right to withhold any greater sum from their proceeds ... than was owing to plaintiff for materials furnished to the lots specified in the billings.

*Rollingwood,* 17 Cal.Rptr. at 5, 366 P.2d at 448. One commentator concluded that the method of calculating' progress payments reflected the "implied intention" of the parties, taking the case outside the joint check rule. *See* Moss, *Joint Checks: Practices in the Construction Industry,* 43 Cal.St. B.J. 242, 246 (1968).

The *Post* court later discussed the joint check rule as applied to progress payments. Although the case did not involve a progress schedule, the court stated that, in order to determine his share of a joint check, a materialman "must determine whether all of the job is covered by the joint check or whether it is merely a progress payment." *Post,* 141 Cal.Rptr. at 31, 569 P.2d at 136. In the case of a progress payment, the court apparently intended to require that the materialman retain only the amount due on the work the progress payment covers. A practitioner recently summarized the California rule:

> [W]here the jointly payable check is for specifically designated lots, the materialman is required only to credit against materials delivered to the specified lots, not for all other materials furnished on a particular project. He accordingly may sue for works of improvement not covered by the checks.

H. Marsh, *California Mechanics' Lien Law* § 8.23 (4th ed. 1985). Other state courts have followed this rationale. *See, e.g., Medford School Dist.,* 76 Or.App. 99, 708 P.2d 623 (materialman only obligated to deduct amount due as of date check covers).

■ We are persuaded by this reasoning. We believe an agreement designating joint checks as payment for specified progress work on identified buildings may support a finding of an implied agreement as to allocation of proceeds, but hold that the facts before this court are insufficient to support a grant of summary judgment in favor of either party. The record does not show that Brown had knowledge concerning the manner in which the amount of the joint checks was calculated, nor does it indicate how Brown calculated the amount retained. The checks do not appear to include a notation specifying either the amount included for materials or the building and level of progress the check covers. Brown concedes that it had no direct communication with BOA concerning allocation of the proceeds of the checks. It is unclear, however, whether Brown was aware of the method of determining progress payments or whether it had knowledge through access to documents or other means concerning the basis for calculation of the checks. The case must be remanded to the trial court for determination of these disputed factual issues.

## CONCLUSION

We adopt the joint check rule in Arizona, but note that the rule will not shield an

owner/general contractor to the extent that his obligation on the particular subcontract remains unsatisfied.

We further hold that an agreement providing for progress payments by joint checks covering specified buildings may constitute an implied agreement as to allocation of the proceeds of the joint checks. We base this decision on testimony in the record regarding the common commercial understanding of materialmen and contractors regarding this type of progress payment agreement. However, for such an implied agreement to exist, the materialman must be aware of the nature of the joint checks—that, rather than general payments, they are limited to specifically designated buildings or lots.

The record in this case does not establish whether Brown was aware of these facts, and we therefore reverse the trial court's grant of summary judgment and remand to the trial court for determination of these issues. The court of appeals decision is vacated.

GORDON, C.J., FELDMAN, V.C.J., and CAMERON and MOELLER, JJ., concur.