549 A.2d 1163

ALLIED BUILDING PRODUCTS CORPORATION

v.

UNITED PACIFIC INSURANCE COMPANY.

No. 279, Sept. Term, 1988.

Court of Special Appeals of Maryland.

Nov. 10, 1988.

Miller John Poppleton, Jr. (John A. Taylor and Protas & Spivok, Chartered, on the brief), Rockville, for appellant.

William M. Huddles (Andrew H. Vance and Braude & Margulies, P.A., on the brief), Baltimore, for appellee.

Argued Before GILBERT, C.J., and ROSALYN B. BELL and FISCHER, JJ.

ROSALYN B. BELL, Judge.

Allied Building Products Corporation (Allied) appeals from a decision of the Circuit Court for Baltimore City granting cross-summary judgment for United Pacific Insurance Company (United Pacific). Allied is a large supplier of roofing and other building materials. United Pacific was the surety of a payment bond posted by Triangle General Contractors, Inc. (Triangle), guaranteeing payment for labor and materials on a State building project. Allied filed suit against United Pacific on August 20, 1987, alleging that it was entitled to relief from United Pacific due to the nonpayment of a subcontractor, Sain & Son Contractors, Inc. (S & S).

We are presented with two issues in this appeal:

—Did a joint check agreement operate to extinguish Allied's right to recover under Maryland's Little Miller Act?

—Was Triangle's affidavit, alleging that Allied had billed it for more roofing materials than actually delivered, sufficient to withstand Allied's summary judgment motion?

We reverse and remand.

The relevant facts are as follows. Triangle was the general contractor on a State project to construct the Francis Scott Key Elementary–Middle School in Baltimore City. United Pacific, appellee, was the surety for Triangle in accordance with Triangle's obligations to provide a payment bond pursuant to § 13–501(a)(2) of the Little Miller Act, Md.State Fin. & Proc.Code Ann. (1985). Briefly stated, this section requires a general contractor to post a payment bond in any construction contract awarded by the State which exceeds $50,000 in order to make certain that persons providing building materials are paid. By providing the payment bond, United Pacific guaranteed payment to all persons supplying materials for the school building project

undertaken by Triangle. S & S, a construction subcontractor for Triangle, used roofing and other building materials supplied by Allied, which Allied delivered to the job site.

After the project was underway, Allied became concerned about receiving its payments on an open account it had provided to S & S. Consequently, Allied, S & S, and Triangle entered into a joint check agreement in November of 1985, pursuant to which Triangle agreed to pay S & S with joint checks made payable to S & S and Allied, thus ensuring that Allied would be paid for the building materials it had supplied to S & S. The agreement provided that Triangle assumed no liability for any materials purchased in excess of $100,000. Nevertheless, Triangle paid out a total of $123,846.74 to Allied under the joint check agreement.[1] When S & S did not meet its obligations, Allied gave nc and filed suit on the payment bond underwritten by United Pacific, claiming an unpaid balance of $75,889.18 for building materials delivered to the job site.

The trial court granted Allied's summary judgment motion on November 10, 1987, and United Pacific filed a motion to vacate the judgment, a motion in opposition of the summary judgment, and a cross-motion for summary judgment on November 20, 1987.[2] These motions were heard in an unrecorded hearing in chambers on January 5, 1988. Judgment was entered in favor of United Pacific on both motions. Because the hearing was unrecorded, we can only assume that the trial court entered judgment for United Pacific based on its pleadings, which asserted, in essence, that the joint check agreement limiting Triangle's liability

---

1. Although the record extract does not specify, we assume Allied did furnish at least $100,000 in materials and was paid for them out of the $123,846.74 as no issue is raised in this regard.

2. United Pacific's motion to vacate alleged that the parties had agreed to extend the time in which United Pacific could file a response to Allied's summary judgment claim. Apparently, the trial court was unaware of this agreement, and believed that Allied's motion was unopposed.

to $100,000 operated as a waiver of Allied's rights under the Little Miller Act.

The effect of the joint check agreement is thus the primary issue in this case. We hold that the lack of a specific waiver was fatal to United Pacific's cross-motion. The second question involves Allied's own motion, and for that answer we revisit the problem of the adequacy of an affidavit opposing summary judgment. We hold that United Pacific's affidavit was sufficient to raise a material factual issue regarding delivery, and as a result, Allied was not entitled to summary judgment. We begin our explanation with a brief history of the Little Miller Act and what it was intended to accomplish.

## HISTORY

Construction projects such as office buildings and factories have increased dramatically. These projects typically involve large amounts of money; hence, if the contractor's business failed, suppliers who had extended credit could suffer substantial losses. Since suppliers had no recourse at common law, statutes providing for mechanics' liens were enacted to address this problem. *See* Cahn, *Contractors' Payment Bonds in Maryland*, 32 Md.L.Rev. 226 (1972).

Public projects such as schools, highways and public hospitals were typically exempt from mechanics' liens, however, and suppliers on State public projects in Maryland had no remedy until 1918, when Maryland adopted its version of a federal law known as the Heard Act, which required contractors to post bonds for State projects. 1918 Md.Laws ch. 127. In 1959, Maryland replaced this law with a new statute requiring contractors to post payment bonds on State construction projects. This new statute was patterned on a federal act known as the Miller Act.[3]

---

**3.** The Heard Act, ch. 280, 28 Stat. 278 (1894), the predecessor of the Miller Act, 40 U.S.C.A. §§ 270a–270d (1986), required federal government contractors to execute bonds for the benefit of all persons

Although nothing in the legislative history of the Maryland Act explicitly states that it was based on the federal Miller Act, the legislative history does show parallel development and, except for minor variations, the language of the two statutes is essentially the same. *Williams Constr. Co. v. Construction Equip. Inc.*, 253 Md. 60, 61, 251 A.2d 864 (1969); *Viscount Constr. Co. v. Dorman Elec. Supply Co.*, 68 Md.App. 362, 363, 511 A.2d 1102 (1986). In fact, the statute is commonly referred to as the "Little Miller Act."

Maryland State Fin. & Proc.Code Ann. §§ 17–101 through 17–110 (1988)[4] sets out the Little Miller Act in its present form, and provides in pertinent part:

**"17–103. Security on construction contracts.**

"(a) **Contracts exceeding $50,000.**—(1) Before a public body awards a construction contract exceeding $50,000, the contractor shall provide payment security and performance security that meet the requirements of § 17–104 of this subtitle.

"(2) The security shall be:

(i) for performance security, in an amount that the public body considers adequate for its protection; and

(ii) for payment security, at least 50% of the total amount payable under the contract."

---

supplying them with labor and materials. In 1935, the Miller Act superseded the Heard Act but continued its basic provisions to protect those whose labor and materials went into federal construction projects. Congress intended the Miller Act to correct certain procedural limitations of the Heard Act. *MacEvoy Co. v. United States,* 322 U.S. 102, 104–06, 64 S.Ct. 890, 892–93, 88 L.Ed. 1163 (1944).

By ch. 127 of the Laws of 1918, Maryland adopted its own equivalent of the Heard Act which required contractors to post bonds for State projects. In 1959, Maryland repealed this law (Art. 90, § 11 (1957)) and enacted a new § 11 which protected suppliers and subcontractors by requiring bonds for all building contracts in excess of $5,000 awarded by the State. 1959 Md.Laws ch. 10.

**4.** At the time of the dispute in the instant case, the Little Miller Act was codified at Md.State Fin. & Proc.Code Ann. § 13–501 (1985).

"17–104. Type of security.

"Payment security or performance security required under this subtitle shall be:

(1) a bond executed by a surety company authorized to do business in the State...."

The purpose of the Little Miller Act is remedial. The Act is intended to protect suppliers on State and other public projects where they would otherwise have no lien as a result of sovereign immunity. *Hamilton & Spiegel, Inc. v. Board of Educ. of Montgomery County,* 233 Md. 196, 200, 195 A.2d 710 (1963). The Act is to be liberally construed to effectuate this public purpose. *Montgomery County Bd. of Educ. v. Glassman Constr. Co.,* 245 Md. 192, 201, 225 A.2d 448 (1967).

Under the Miller Act,

"[t]he liability of the surety is measured by that of the prime contractor for the bond. The liability of the prime contractor to a project supplier of a subcontractor is governed by the subcontractor's obligation."

*D & L Constr. Co. v. Triangle Elec. Supply Co.,* 332 F.2d 1009, 1013 (8th Cir.1964). The obligation is one, not of contract, but of statute, and therefore privity is not required. The liabilities of lower tier subcontractors to their suppliers are passed up the ladder to the surety. For example, in the instant case, it is S & S's liability to Allied that becomes the benchmark in determining Allied's damages as against Triangle, and ultimately United Pacific.

What is significant about both the federal and the state acts is that, although there have been amendments to both statutes,[5] the basic coverage, purpose and procedures remain substantially the same. Generally, this Court will look to federal decisions construing the Miller Act to provide guidance in interpreting the Little Miller Act. *Vis-*

---

**5.** Significant amendments to the Little Miller Act required contractors to make written certification that all subcontractors and suppliers were paid in accordance with their contracts (1968 Md.Laws ch. 525), increased the minimum contract amount to $25,000 (1980 Md.Laws ch. 655), and subsequently to $50,000 (1984 Md.Laws ch. 479).

*count,* 68 Md.App. at 366, 511 A.2d 1102; *General Fed. Constr., Inc. v. D.R. Thomas, Inc.,* 52 Md.App. 700, 709, 451 A.2d 1250 (1982); *Montgomery County v. Glassman,* 245 Md. 192, 201, 225 A.2d 448 (1967).

### EFFECT OF THE JOINT CHECK AGREEMENT

■ On appeal, Allied contends that the trial court erred in granting judgment for United Pacific, asserting that at no time did it waive its right to the protection of the Little Miller Act. On the other hand, United Pacific asserts that it had no obligation to Allied because Triangle fulfilled its obligations under the joint check agreement. Since Triangle had no further liability to Allied, United Pacific claims it follows that it had no liability as Triangle's surety. We disagree with United Pacific's position, and explain.

Whether the cross motion for summary judgment was properly granted to appellee rests on the claim that Triangle's liability to appellant under the Little Miller Act was limited to $100,000. The joint check agreement was in the form of a letter from Triangle to S & S dated November 25, 1985. The letter stated in pertinent part:

"You have asked us to make checks in payment for your work, under the above referenced contract, payable jointly to you and to Allied Roofers Supply Corporation. We are willing to do this, and will do so, subject to the following conditions:

\* \* \* \* \* \*

"2 We assume no liability for any materials purchased in excess of the total purchase of One Hundred Thousand Dollars and no/cents. Tax Included, ($100,000.00). Also we assume no liability for any materials not delivered to the job site and signed for by Triangle General Contractor's job superintendent for verification."

"3. We will require a partial Release of Liens, and a Release of rights against our Payment Bond, from both

you and your supplier as a condition of each payment to you.

"4. Also it is agreed, that all joint check payments will be applied by the Supplier to only S & S Drywall Contractor's account for the Francis Scott Key Middle School and no other accounts."

The letter was accepted by Triangle, S & S and Allied.

The Court of Appeals held in *N.S. Stavrou, Inc. and Reliance Insurance Co. v. Beacon Supply Co.*, 249 Md. 451, 458–59, 240 A.2d 278 (1968), that the joint check agreement was not intended to guarantee payment in lieu of the contractor's bond obligation. The joint check agreement in *Stavrou* imposed a duty on the contractor to pay the supplier for materials not to exceed $20,000. The Court held that the contractor's conduct had the effect of exceeding this obligation. *Stavrou*, 249 Md. at 451, 240 A.2d 278. The Court pointed out that the contractor could have protected himself by requiring (in addition to the joint check agreement) the supplier to execute a bond waiver, but this was not done. The Court noted that in order to prevail the contractor "would had to have shown by a fair preponderance of the evidence an express or implied waiver on the part of [the supplier]...." *Stavrou*, 249 Md. at 458, 240 A.2d 278. Thus, the Court implicitly would have required language additional to or more specific than that of the joint check agreement in *Stavrou* in order to find a bond right waiver. The *Stavrou* Court, however, did not elaborate on what sort of language could constitute an express or implied waiver.

While the Maryland courts have not considered the question of exactly what would constitute a waiver of rights under the Little Miller Act, there are a number of federal cases regarding waiver of rights. Therefore, we turn to these cases for guidance.

In *Warrior Constructors, Inc. v. Harders, Inc.*, 387 F.2d 727 (5th Cir.1967), the Court observed that the right to sue on a Miller Act surety bond is a right created by the

statute. If a supplier is not paid, his only remedy is suit under the Act. Therefore, a waiver or release is a "drastic curtailment of these rights," and it will not "be read into a general agreement absent clear expression to that effect." *Warrior Constructors, Inc.*, 387 F.2d at 729.

In *United States ex rel. Koppers Co. v. Five Boro Construction Corp.*, 310 F.2d 701, 703 (4th Cir.1962), the Court held that a supplier had not waived its Miller Act rights by entering into a joint check agreement with the contractor and subcontractor. The agreement, reached by letter, was entered into after the supplier became apprehensive concerning the subcontractor's ability to pay for railroad materials delivered for a Navy building project. The Court found nothing in the joint check agreement which indicated that the supplier intended to waive its rights, observing that the supplier had three options when the subcontractor's ability to pay became questionable. The supplier could have (1) continued supplying materials until the job was completed and then file against the payment bond pursuant to the Miller Act, (2) refused to deliver any more materials, or (3), as happened in *Koppers*, agreed to deliver supplies pursuant to a joint check agreement. The Court stated:

> "This insured payment to [the supplier] as the work progressed instead of delay in payment until completion of the job, but a request for and the acceptance of additional security does not indicate an intention to waive the right to that already in hand."

*Koppers*, 310 F.2d at 703.

*United States ex rel. Clark–Fontana Paint Co. v. Glassman Construction Co.*, 397 F.2d 8 (4th Cir.1968), involved a factual situation similar to that in the instant case. In *Clark–Fontana*, a paint supplier agreed to supply materials to a subcontractor, but requested the general contractor to make its checks jointly payable to the paint supplier and the subcontractor. Each check contained a notation that the subcontractor and supplier "waived and released to the extent of the full face value hereof any right any of them

may have" to assert a claim under "any bond" given by the contractor. *Clark–Fontana*, 397 F.2d at 9. The supplier then allowed the subcontractor to keep most of the proceeds of these checks because the subcontractor was having trouble meeting his payroll. This subcontractor eventually went bankrupt, and the supplier filed suit under the Miller Act to recover the unpaid balance. The defendants (contractor, insurance company and subcontractor) claimed that the language on the checks constituted a waiver of the supplier's right to recover under the Miller Act. *Clark–Fontana*, 397 F.2d at 10.

The Court held that the notation was not a waiver because its language did not explicitly "say that the materialman [supplier] was obligated to deduct his current due from each check at the peril of losing his statutory rights." *Clark–Fontana*, 397 F.2d at 10. The Court stated:

"[W]e do not hold that protection of laborers and materialmen may never be accomplished by other means so as to avoid the general contractor's statutory obligation. But where that result is attempted by means of express waiver, we think that congressional purpose requires that waiver be clear and explicit.... Absent the clear language of an express waiver, we think that none is to be implied; as we have held in the past, requesting and accepting additional security does not indicate an intention to waive the right to that already in hand."

*Clark–Fontana*, 397 F.2d at 10–11 (citation omitted).

*Clark–Fontana* illustrates the approach taken by the federal courts—while it is possible for a supplier to waive his rights under the Act, *see, e.g., United States ex rel. B's Co. v. Cleveland Electric Co.*, 373 F.2d 585, 588 (4th Cir.1967), "the federal courts have been uniform in their insistence that a waiver be clear and explicit." *United States ex rel. Youngstown Welding & Eng'g Co. v. Traveler's Indem. Co.*, 802 F.2d 1164, 1166 (1986). We adopt the federal position, holding that only a clear and express waiver will terminate a supplier's rights under a Little Miller Act payment bond, and that the taking of additional

security by itself does not constitute a waiver of a bond claim. In the instant case, the joint check agreement did not waive Allied's rights under the Little Miller Act.

The joint check agreement itself, and the circumstances prompting its creation, indicates that it was intended to create additional security for Allied—*not* to narrow the security Allied already possessed under the Little Miller Act. The agreement came into being because Allied was concerned that S & S was a poor credit risk.[6] It was obviously Allied's reluctance to give S & S materials on credit which induced S & S to ask for this arrangement, as evidenced by the letter creating the joint check agreement, sent by Triangle to S & S, which began: "You have asked us to make checks in payment for your work ... payable jointly to you and to Allied...." Simply put, Allied would not have given S & S roofing materials unless it had some additional assurance of payment. Since paragraph 2 of the Joint Check Agreement limits the liability that Triangle would *"assume"*, it is expressly indicative of the parties' intention that they were *creating* rights in Allied as against Triangle, not limiting ones that already existed, so that Allied would continue to supply the project.

As in *Koppers*, Allied as a supplier could have continued supplying materials to the job site and then filed (after proper notice) under the payment bond or it could have simply refused to supply any more materials on credit. It opted instead to work matters out via an agreement which was nothing more than a joint check agreement.

■ Joint check agreements are a commonly used payment method in the construction industry.

"In order to induce a supplier to deal with a subcontractor whose credit is questionable, the general contractor

---

6. Allied's concern about S & S's credit is evidenced by the fact that it used S & S's credit application as an exhibit in its bond action. The credit application showed that S & S had been in existence for just two-and-one-half years, was a father-son operation, and had never done business with Allied before.

may agree to pay the subcontractor with checks payable to the joint order of the subcontractor and the supplier." Cahn, *Contractors' Payment Bonds in Maryland* at 259. The subcontractor endorses the checks and turns them over to the supplier. The supplier then deducts the amount owed for materials, and returns the balance. *Id.*, at 259. Triangle and United Pacific *could* have had Allied execute a waiver of its bond rights, but did not. The situation in the instant case is thus similar to *Stavrou*, where the Court declined to find a waiver in the joint check agreement. As held in *Koppers*, a joint check agreement, standing alone, will not constitute a waiver.

Moreover, the language in this agreement is far less specific than that contained in *Clark–Fontana*, which the Court held not specific enough to constitute a waiver. Additionally, paragraph 3 of the joint check agreement specified that Triangle "will require ... a [r]elease of rights against our [p]ayment [b]ond from both you and your supplier as a condition of each payment to you." "Will require" clearly indicates future action, and by drafting this provision Triangle clearly contemplated obtaining separate signed releases for each payment at some future date. This provision would have no meaning if the paragraph immediately before it, paragraph 2, was intended by the parties to be a complete waiver.

▮ Finally, United Pacific argues that, by paying Allied in excess of the stated $100,000.00 contract limit, Triangle fully satisfied its contractual obligation and hence no waiver is involved. We think that any distinction to be made here between a liability cap and a waiver is academic at best. Following Union Pacific's line of reasoning to its logical end, prior to the execution of the joint check agreement Allied possessed the right to sue under the Little Miller Act without limitation as to amount. Yet, Union Pacific contents that, immediately *after* the joint check agreement was executed, Allied's right to sue under the Miller Act for sums in excess of $100,000 suddenly disappeared. How would this be possible except by virtue of

waiver?  Since the joint check agreement did not constitute a waiver, we hold the trial court erred in granting the cross-summary judgment to United Pacific.[7]

### AFFIDAVIT IN OPPOSITION TO SUMMARY JUDGMENT

■ Allied contends that the trial court erred in vacating the judgment originally entered in its favor, asserting that it is entitled to judgment as a matter of law.  Allied argues that evidence produced by United Pacific was inadequate to show that a genuine controversy as to a material fact existed.  Accompanying United Pacific's motion in opposition to summary judgment were exhibits consisting of, *inter alia,* affidavits of Triangle's vice president, Jack Leone, alleging that Triangle's job superintendent had not signed tickets for $75,889.18 worth of materials which Allied claimed to have delivered to the job site.  Based upon his review of Triangle's records and the job specifications, Leone stated in his affidavit that, if Allied had supplied as much acoustical tile and drywall as it had billed on its invoices, Triangle would have had a great deal of these materials left over after the job was completed.  Leone stated that there had been no excess after the project was completed.  A similar situation existed as to drywall Allied claimed to have supplied.

Subsection (b) of Rule 2–501 provides that

---

7. On appeal, appellant argues for the first time that to construe the Joint Check Agreement as a bond waiver under the Little Miller Act would directly contravene Md.Real Prop.Code Ann. § 9–113(a) (1988 Repl.Vol.), which provides as follows:

"An executory contract between a contractor and any subcontractor that is related to construction, alteration, or repair of a building, structure, or improvement may not waive or require the subcontractor to waive the right to:

"(1) Claim a mechanic's lien;  or

"(2) Sue on a contractor's bond."

Maryland Real Prop.Code Ann. § 9–113(b) (1988 Repl.Vol.), provides that "any waiver provision of a contract made in violation of this section is void."  While it is not necessary to construe this section in order to reach our decision, our holding appears consistent with this provision.

"[t]he response to a motion for summary judgment shall identify with particularity the material facts that are disputed. When a motion for summary judgment is supported by an affidavit or other statement under oath, an opposing party who desires to controvert any fact contained in it may not rest solely upon allegations contained in the pleadings, but shall support the response by an affidavit or other written statement under oath."

The court may, and should, grant a summary judgment motion when the moving party is entitled to judgment as a matter of law *and* there is no genuine dispute as to any material fact. Rule 2–501(e); *Lowman v. Consolidated Rail Corp.*, 68 Md.App. 64, 509 A.2d 1239, *cert. denied*, 307 Md. 406, 514 A.2d 24 (1986). Summary judgment is not, however, "a substitute for a trial, but a means by which the trial court may determine, summarily, whether a trial is necessary." *Syme v. Marks Rentals, Inc.*, 70 Md.App. 235, 238, 520 A.2d 1110 (1987) quoting *Washington Homes, Inc. v. Interstate Land Dev. Co.*, 281 Md. 712, 716, 382 A.2d 555 (1978).

The Court of Appeals has indicated that a trial court must accord great deference to the party opposing summary judgment. The trial court should not attempt to resolve any issue of fact or witness credibility, but instead should leave these matters for the trier of fact. *Impala Platinum, Ltd. v. Impala Sales (U.S.A.) Inc.*, 283 Md. 296, 326, 289 A.2d 887 (1978). In *Syme*, we observed that the Court of Appeals has applied a broad standard when determining whether there is a genuine dispute of fact, such that, even where the underlying facts are undisputed, if those facts are susceptible of more than one possible inference, the choice between those inferences should be made by the trier of fact. *Syme*, 70 Md.App. at 238–39, 520 A.2d 1110, citing *Fenwick Motor Co. v. Fenwick*, 258 Md. 134, 138, 265 A.2d 256 (1970). *See also, Berkey v. Delia*, 287 Md. 302, 305, 413 A.2d 170 (1980). The trial court, therefore, must resolve all inferences against the party seeking disposition of the case

on summary judgment. *Honaker v. W.C. & A.N. Miller Dev. Co.*, 285 Md. 216, 231, 401 A.2d 1013 (1979).

In *District Heights Apartments, Section D–E, Inc. v. Noland Co.*, 202 Md. 43, 95 A.2d 90 (1953), the owners contended that the supplier had not proved that certain materials, which were the subject of a mechanics' lien suit, had actually been delivered to the job site. Judge Delaplaine opined for the Court of Appeals in *District Heights*, 202 Md. at 51, 95 A.2d 90:

> "[I]t will be presumed that all materials [which the supplier] shipped to the [owner] were duly delivered, in the absence of some direct evidence to the contrary."

Here, as in *District Heights*, a prima facie case is made that the materials as ordered and charged were delivered to the contractor. Here, as in *District Heights*, a prima facie case has been established; hence, the burden shifts to the nonmoving party "to support his defense by facts which are or ought to be within his knowledge." *District Heights*, 202 Md. at 50, 95 A.2d 90.

Because the hearing was unrecorded,[8] we cannot ascertain whether the issue raised in United Pacific's affidavits was considered and decided by the trial judge. The record before us indicates only that the trial judge concluded that United Pacific should prevail on its cross-motion for summary judgment which relied on Triangle's limited liability in the joint check agreement. Ordinarily, we will not consider an issue which has not been raised in and decided by the trial court. Rule 8–131. In the instant case, however, the affidavits were in the court file at the time of the unrecorded hearing, hence the issue should have been considered by the trial judge in determining whether there was a genuine dispute as to a material fact.

---

**8.** Rule 1224 provides that "Upon specific request of the judge or a party, the entire or any designated part of the hearing on motions ... before the court," the proceeding should be recorded. Where the matter may result in final disposition of the entire case, unrecorded hearings are rarely appropriate. This was not one of those rare occasions.

We look then to the affidavit as filed. In the supplemental affidavit, Leone stated he had reviewed the books and records of Triangle. He contended that Allied did not supply the amount of materials it is alleged to have supplied. He gave two examples in support: (1) 52,640 square feet of acoustical tile were delivered, and Triangle bought and used 56,088 square feet of tile from another source. The plans required only 79,750 feet of tile. This would provide an excess, but Triangle had "virtually no excess" tile. Hence, the amount was overstated. (2) appellant delivered 68,308 square feet of ½ inch fire code drywall to the project. The plans only included approximately 32,794 square feet of fire code drywall. Again, he posits Triangle had "virtually no excess" ½ inch fire code drywall when the project was completed. Although no documents are attached to support the allegation that Allied did not deliver the quantities claimed, the supplemental affidavit does include statements from which one could make that inference. The ultimate question is whether those conclusions or excerpts from documents Leone allegedly reviewed could have been received in evidence. We conclude that the documents probably would have been admitted after proper foundation as business records.

While appellant is entirely correct in stating that the affidavit is self-serving, if the project plan did call for a lesser amount of material than was delivered, and if the delivery tickets were unsigned, and if there were very little materials left over, a fact finder could infer that Allied did not make the deliveries as alleged. The fact that contrary inferences are more plausible does not suffice. The affidavit need not negate all other possibilities. The affidavit need not allege that the materials were not in fact delivered, for the inference is sufficient. In reviewing the propriety of the grant of summary judgment, we are

> "concerned primarily with deciding whether a factual issue which was material to the resolution of the controversy exist[ed] and whether the trial judge was legally correct."

*Lynx, Inc. v. Ordnance Prods., Inc.*, 273 Md. 1, 8, 327 A.2d 502 (1974). We hold the affidavit met that minimum standard. Hence, appellant was not entitled to the summary judgment sought.

JUDGMENT VACATED AND CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE BORNE ONE-HALF BY APPELLANT AND ONE-HALF BY APPELLEE.