599 A.2d 222

CITY OF PHILADELPHIA for the Use of ALLIED ROOFERS SUPPLY CORPORATION and Allied Roofers Supply Corporation, Appellants,

v.

JOSEPH S. SMITH ROOFING INC., Joseph S. Smith, James F. Sunday, Fireman's Fund Insurance Company, J.J. White Incorporated, John S. McQuade Co., Foster Schermerhorn Barnes Inc., and Kelso Construction Company Inc., Individually and as Partners t/a FSB/Kelso and KSB/Kelso Joint Venture.

Superior Court of Pennsylvania.

Argued Dec. 6, 1990.

Filed Nov. 18, 1991.

96

98

Daniel M. Replogle, Camden, N.J., for appellants.

Patrick T. Henigan, Philadelphia, for appellees.

Before CAVANAUGH, OLSZEWSKI and FORD ELLIOTT, JJ.

FORD ELLIOTT, Judge:

This is an appeal from the June 4, 1990 order in the Court of Common Pleas of Philadelphia County denying appellants' post-trial motions and affirming the judgment entered on March 17, 1990 following a non-jury trial before the Honorable Nelson A. Diaz. Appellant, a supplier of roofing materials, initiated the underlying breach of contract action in an attempt to recover monies owed by appellees, the general contractor and its surety, pursuant to joint payment agreements on two separate construction projects.

Appellee, J.J. White, (hereafter referred to as "White"), was a general contractor for two construction projects for the city of Philadelphia: the Queen Lane project and the Divine Providence Village project. White engaged Fireman's Fund Insurance Company, (hereafter referred to as "Fireman's Fund"), to act as surety on the Queen Lane Project for the City of Philadelphia. Thereafter, White entered into a subcontract with Joseph Smith Roofing Company, (hereafter referred to as "Smith"), whereby Smith would perform roofing work on both construction projects. Subsequently, Smith entered into a supply contract with appellant, Allied Roofers Supply Corporation, (hereafter referred to as "Allied"), whereby Allied would supply materials to Smith for the two projects.

As a requirement for supplying material to Smith, Allied required the execution of joint payment agreements. Smith and Allied entered into separate but identical joint payment agreements with White on both projects which provided:

(A) All checks drawn in payment for materials shipped by [Allied] to the [project sites], are to be drawn jointly to [Allied] and [Smith].

(B) Payments for the material are to be made in accordance with terms and conditions of [the subcontract(s)].

(C) Payments for the material to [Allied] according to Paragraphs "A" and "B" above are contingent upon Allied's delivery of the material to the [site] and subcontract noted in "B" above.

(D) Payment is to be mailed to [Allied], 2430 East Tioga Street, Phila, PA 19134.

As set out above, under the language of paragraphs (A) and (B) of the agreement, all checks drawn in payment for materials shipped by Allied to the site were to be drawn jointly to Allied and Smith, and payments for the materials were to be made in accordance with the terms and conditions of the subcontract(s) between Smith and White.

Provision 13 of the subcontracts between Smith and White defined the terms and conditions of payments for work performed as follows:

The Subcontractor, unless otherwise directed by the Contractor, shall submit to the Contractor at the end of each month a requisition containing an itemized estimate of the Subcontract Work done and materials furnished and incorporated into the Project which shall be in such form and be supported by such information, certificates and documents as the Contractor shall require. The amount to which the Subcontractor shall be entitled upon any such monthly estimate shall be the amount approved by the Architect/Engineer and/or Owner and Contractor. The Contractor shall pay to the Subcontractor, on or about the twenty-fifth day of the following month 90% of the amount approved by the Architect/Engineer and/or Owner and Contractor.

The balance due or final payment to the Subcontractor shall be paid, by the Contractor to the Subcontractor, upon the expiration of thirty (30) days from the date of the completion of the Project, when accepted and certified by the Architect/Engineer and/or Owner and Contractor whichever the case may be.

Should it appear at any time that the Subcontractor, or anyone performing any part of the Subcontract Work, has not paid any amount due for labor, materials, equip-

ment, or services supplied in connection with the performance of the Subcontract Work, the Contractor shall have the right, but not the obligation, to retain out of any payment then due or thereafter to become due the Subcontractor, monies sufficient to pay such amount. If all payments due hereunder have been made to the Subcontractor, the Subcontractor shall refund such amount to the Contractor.

In accordance with this provision, at the end of each month Smith would submit to White a requisition for payment. The requisitions would request that checks be made payable solely to Smith or that checks be made payable jointly to Smith and Allied evidencing materials used and incorporated into the project. Each payment requisition contained a form certification, signed by the president of Smith, that all amounts due and owing for materials had been paid in full except as noted. Each time a joint check was issued, it was mailed to Allied and Allied retained all the proceeds and credited the amount toward Smith's account.

As a result of this invoicing procedure, Smith submitted a total of six applications for payment on the Queen Lane Project, five of which followed the execution of the joint payment agreement for amounts totalling $25,572.24. At the instruction of Smith, White paid only two of these applications with jointly payable checks for a sum total of $4,817.34. Smith did not complete the work on the Queen Lane Project and White was required to secure another subcontractor for completion of the project. The substitute contractor testified that there were no materials at the job site when he took over the work. Allied claims that it supplied materials in the amount of $19,994.36 on the Queen Lane Project. Having retained all the proceeds of the joint checks issued in the amount of $4,817.34, Allied claims it is still owed $15,177.02.

On the Divine Providence Project, Smith submitted seven invoices for payments, only four of which requested the issuance of jointly payable checks. The sum total of the

seven invoices was $74,788.44. Allied claims that it has received $37,364.16 through joint checks for materials supplied on the Divine Providence Project but is still owed $25,143.72. The estimated cost for materials submitted by Smith to White for the project was $33,000. No final payment has ever been issued on the Divine Providence Project.

Allied first argues that White unilaterally modified the joint payment agreement by failing to issue *all* checks on both projects payable jointly to Smith and Allied and that this breach includes the failure to issue a final payment on the Divine Providence Project made jointly payable to Smith and Allied.

Based on the language of the joint payment agreements, the language of the subcontracts incorporated therein, and the business dealings of the parties, we find no merit to Allied's argument that White was required to issue all checks on the projects jointly payable to itself and Smith. Rather, we find the conduct of White to be in compliance with the terms of the joint payment agreement, rather than a modification thereof.[1]

The joint payment agreement between the parties herein represented nothing more than a joint check arrangement. As used in the construction industry, such arrangements provide that the general contractor will issue the progress payments to the subcontractor in the form of jointly payable checks to the subcontractor and its materials supplier. As noted by one commentator:

Joint check arrangements may be initiated by parties at the top or bottom of the contract claim. For example, the

---

1. Allied argues that there is another basis for finding liability on behalf of White, and refers this court to *Washington Steel Form Company v. North City Trust Co.,* 308 Pa. 351, 162 A. 829 (1932). However, *Washington Steel, supra,* is inapplicable factually to the instant case, as it involved the assignment of a builder's contract to a trust company as collateral security for a loan. Under the terms of the assignment, the trust company assumed the obligation of paying all debts owed by the builder on the contract. The instant agreement cannot be construed for any purpose as an assignment.

general contractor may wish to insure that the party receiving the check (e.g., the subcontractor) will properly disburse the proceeds of the check to his supplier or subcontractors. In this manner the general contractor reduces the chances that his subcontractor will pocket the money and leave the supplier unpaid, thus provoking the supplier to file mechanic's liens or make claims against the general contractor's payment bond.

Similarly, the supplier or sub-subcontractor may initiate the joint check arrangement to make sure that the subcontractor won't run off with the progress payments and leave him out in the cold. The supplier may desire this arrangement because the subcontractor is in financial trouble or lacks assets, or because he has never done business with the subcontractor before. Sometimes, the supplier will request a joint check arrangement out of simple mistrust of him.

*Barrett, Joint Check Arrangements: A Release for the General Contractor and Its Surety,* 8 Constr.Law. 7, 7 (1988).

While no Pennsylvania court has yet addressed the legal ramifications of joint payment agreements, they have been approved in numerous other jurisdictions. *See Brown Wholesale Electric v. Beztak,* 163 Ariz. 340, 788 P.2d 73 (1990) [2]; *Medford School Dist. v. Peterson,* 76 Or.App. 99,

---

**2.** The trial court relies on the intermediate appeals court decision in *Brown,* found at 160 Ariz. 582, 774 P.2d 1372 (1989). In that decision, the Arizona court of appeals, held that in the absence of an agreement to the contrary, where a materialman is paid an amount equal to what is owed by way of contractor issued joint checks, and the materialman endorses the joint checks but fails to retain amounts sufficient to satisfy the entire debt of the subcontractor, it thereafter cannot proceed against the general contractor for any amounts left owing. This holding illustrates what is known as the joint check rule and has been applied by courts in various jurisdictions on the basis of estoppel or accord and satisfaction. However, on appeal to the Arizona Supreme Court, this application of the joint check rule was reversed. While adopting the rule in principle for Arizona, the court determined that under the facts of that case, absent any agreement on allocation of proceeds, the materialman's endorsement of joint checks issued as progress payments, and the retainage of only that portion of the check which represented the amount owed to date, would not preclude a

708 P.2d 623 (1985); *Anchor Concrete Co. v. Victor Savings & Loan*, 664 P.2d 396 (Okla., 1983); *Post Brothers Constr. Co. v. Yoder*, 20 Cal.3d 1, 141 Cal.Rptr. 28, 569 P.2d 133 (1977); *F & C Engineering Co. v. Moore*, 300 S.W.2d 323 (Tex.Civ.App.1957).

In interpreting such agreements, courts have relied upon the intent and language of the agreements as well as industry practice to determine the rights and liabilities of the parties. Instantly, looking to the joint payment agreement between the parties and the payment terms of the subcontract, we determine that the agreement, as prepared by Allied, did not require *all* checks to Smith to be payable jointly but rather only those checks drawn for materials. Allied specifically conditioned payment by joint check on the terms of the subcontract which left complete control in the hands of Smith. This was so even though Allied was fully cognizant of Smith's ongoing financial difficulties which had led to Allied's policy that Smith could only place orders on joint payment accounts. Under the terms of the subcontract, it was Smith who would invoice White and it was Smith who would identify when and what materials were furnished and incorporated into the projects. We agree with the trial court's determination that Allied failed to protect its rights under the contract by endorsing each of the joint checks without insuring that it was receiving sufficient payment for the materials delivered.

By endorsing the joint check, a presumption arises in favor of the contractor, that the materialman has received all sums then owed to him even though, in actuality, this may not be the case. The justification for this presumption is twofold: first, the contractor has contracted with the subcontractor, not the materialman, and therefore the contractor is usually unaware of the nature and amount of the materialman's claim; and second, the materialman

materialman's lien for monies still owed in excess of check amounts actually retained. We find the specific rationale in the appeals court decision, which is relied upon by Judge Diaz, to be unaffected by the reversal.

may protect himself by simply ensuring that with each endorsement proper payment has been received. In joint checks issued by the contractor, inclusion of the material-man as payee represents that the contractor intends to discharge any obligation owed to the materialman.

> ' "If it may reasonably be said ... that a material dealer ... could be so naive as to fail to understand the purpose and intention of an owner in making checks jointly to it and his subcontractor, [the materialman] was at least under the duty of inquiring ... as to his intention with respect to the application of the funds represented by the checks. This [the materialman] failed to do, and it may not now be heard to say that respondent should bear the loss which it sustained as a result of its own impru-dence." ' (*Re–Bar Contractors, Inc. v. City of Los Angeles* [1963], *supra,* 219 Cal.App.2d 134, 136, 32 Cal.Rptr. 607, 608.)

*Post Bros. Constr. Co. v. Yoder, supra,* 141 Cal.Rptr. 28 at 30, 569 P.2d 133 at 135.

We find that until White was notified that Allied was not being paid for all the materials shipped, it was under no obligation under the joint payment agreement to issue all checks jointly payable to Smith and Allied. Each time a joint check was issued under the terms of the subcontract, Smith certified that all monies due and owing for materials were being invoiced. Without notice to the contrary from Allied, White had no reason to doubt the certification. Additionally, the estimate for materials given to White by Smith for the Divine Providence Project was consistent with the joint check amounts issued by White. Under the principles governing joint check arrangements, any loss resulting from the failure to issue the joint checks in the proper amounts must be borne by Allied which did nothing to protect its rights under the agreement by assur-ing that White was being properly and timely charged for materials supplied. However, the question of whether White had any obligation to issue a final payment on the Divine Providence Project jointly payable is subject to a

different analysis which does rely on White's assumed obligations under the joint payment agreement.

In October 1984 Allied notified White that it was not being paid fully for the materials supplied on the Project. White's controller, Thomas Nolan, then notified Smith to take care of the problem. However, based on the notification from Allied of the deficiencies, White issued all checks thereafter jointly payable to Smith and Allied. This amounted to one additional check on the Queen Lane Project and two remaining checks on the Divine Providence Project. No further checks were issued on either project after November 1984. Thereafter, in January 1985 Smith sent a letter to Allied with a copy to White which stated that

> Joseph S. Smith Roofing has agreed that all monies due them from the Divine Providence Project will be sent to allied Roofers Supply (approximately $16,000.00). The J.J. White Company will pay this money upon acceptance of the project by the owner.

Allied's Exhibit, p. 21. It is this letter upon which Allied relies to require White to issue a joint check final payment on the Divine Providence Project. However, what is not clear from the record before this court is whether any application was ever made for final payment for the amounts of retainage on the project. Under Provision 13 of the subcontract between White and Smith, final payment to the subcontractor was to be paid thirty days following completion when the project has been accepted and certified by the appropriate party. Testimony at trial indicated that the Divine Providence Project was completed. Further, it would appear that White has paid $112,152.00 with a retainage of $12,461.40 on the subcontract price. White argues that the right to final payment, if any, enures only for the benefit of Smith and that Smith may not assign its rights under the contract to Allied without White's approval. While we agree with the fundamentals of the legal argument, we are troubled by White's attempt to selectively apply the terms of the subcontract to its benefit.

Following the section of Provision 16 which provides for final payment is another section which reads as follows:

Should it appear at any time that the Subcontractor, or anyone performing any part of the Subcontract Work, has not paid any amount due for labor, materials, equipment, or services supplied in connection with the performance of the Subcontract Work, the Contractor shall have the right, but not the obligation, to retain out of any payment then due or thereafter to become due the Subcontractor, monies sufficient to pay such amount. If all payments due hereunder have been made to the Subcontractor, the Subcontractor shall refund such amount to the Contractor.

Although this section makes it clear that White had the right but not the obligation, to satisfy a debt owed by the subcontractor, this section read in conjunction with the joint payment agreement clearly evidences an intent on the part of White to provide that the materialman be paid. Once White was on notice that Allied was not being paid in full for materials supplied, it decided on its own to issue any remaining checks jointly to Smith and Allied. If, in fact, an additional check is owed to Smith as final payment of the retainage under the subcontract, then White can hardly complain that the check should be issued jointly.

As the trial court made no finding with regard to whether Allied was entitled to a final payment on the Divine Providence Project, we remand for this determination.[3]

Allied next argues that Fireman's Fund, as surety on the Queen Lane Project, became liable when White, the principal obligor, failed to make joint payments to Allied for materials furnished in connection with this project. Allied argues that the trial court incorrectly concluded that Smith, not White, was the primary obligor under the bond. The trial court further erred, according to Allied, in concluding

3. The trial court, in what may have been a misunderstanding, discusses whether a final payment was due on the Queen Lane Project. As this project was defaulted on by Smith, there was never any issue regarding final payment with respect to this project.

that its claim against Fireman's Fund must fail because of its agreement reached with Smith.

Subsequent to Smith's default on the Queen Lane Project, Smith and Allied entered into a Compromise and Settlement Agreement. The agreement specifically provided that Allied agreed to accept partial payment from Smith as full satisfaction of any and all debts presently owed to Allied by Smith. The testimony of Allied's credit manager established that at the time this agreement was entered into, there was only one account maintained for Smith. The agreement set forth a payment schedule which amounted to a repayment of twenty-five cents on the dollar to satisfy the debt.

Fireman's Fund maintains that once the trial court found, as a matter of fact, that Allied had extinguished Smith's debt by accepting a compromised payment, then it correctly concluded that Allied could not attempt to collect that debt under the materialman's bond.

■ We agree with Allied that the trial court incorrectly identified Smith as the principal obligor under the payment bond. Clearly, the language of the introductory paragraph in the bond leaves no doubt that White is the principal obligor under the bond.

KNOW ALL MEN BY THESE PRESENTS, that we, J.J. White, Inc., 550 Bingham Street, Philadelphia, PA 19120, Principal (hereinafter called the Principal Obligor), and Fireman's Fund Insurance Company, ... Surety, are jointly and severally held and firmly bound unto the City of Philadelphia for the use of any and every person, co-partnership, association or corporation interested, in the sum of six million eighteen thousand hundred dollars ($6,018,000.00) ...

However, because we agree with Allied that the trial court erred in incorrectly identifying the principal obligor under the bond, does not mean that we agree that the trial court also erred in concluding that Allied was precluded from seeking recovery under the bond due to its agreement

with Smith extinguishing Smith's debt. To the contrary, we hold that the trial court was correct in reaching such a conclusion.

■■■■ Allied, as a supplier of materials to the Queen Lane Project, is an intended third-party beneficiary of the surety bond. The weight of authority in Pennsylvania provides that suppliers, such as Allied, are third-party beneficiaries under the contractors' surety bonds, whether or not they are specified as such under the language of the bond. As third-party beneficiaries, these suppliers are entitled to bring a direct action against the surety to recover whenever there has been a default in payment. *Concrete Products Co. v. U.S. Fid. and Guar. Co.*, 310 Pa. 158, 165 A. 492 (1933); *Commonwealth v. Great American Indemnity Co.*, 312 Pa. 183, 167 A. 793 (1933).

■■■■ However, the rights of a third-party beneficiary to a contract may rise no higher than the rights of the parties to the contract and are subject to the same defenses and limitations which may be asserted between the promisor and promisee. *Jewelcor Jewelers and Distributors, Inc. v. Corr*, 373 Pa.Super. 536, 542 A.2d 72 (1988), *appeal denied* 524 Pa. 608, 569 A.2d 1367 (1989); *Zimnisky v. Zimnisky*, 210 Pa.Super. 266, 231 A.2d 904 (1967).

Furthermore, any independent acts taken by the third-party beneficiary, in an attempt to secure a debt can often jeopardize its ability to recover against the surety.

> But while the acts of the public agency or the contractor cannot diminish the rights of the supplier as established by the bond, he might by his own acts destroy his right of protection. ... the supplier's primary consideration should be avoidance of any act that might jeopardize that protection; for despite all the precautions taken, and the availability of a bond, the supplier may find that he is not being paid. There may be some understandable hesitancy in giving notice of default; an effort may be made by the supplier to work things out with the contractor....

Should there be a default in payment subsequently, and a claim then made upon the surety, aside from the possible loss of protection because of failure to give timely notice, there is also the probability of a defense to such demand that changes in the time or manner of payment operate to discharge the surety when made without its consent.

Ashe, *Law of Public Improvement Contractors' Bonds,* Commercial Publishing Co., Inc. (1966), at p. 42–43.

Indeed, Allied did fail to protect its own interests with regard to its claim against Fireman's Fund. Clearly, under section 194(b) of the Pennsylvania Bond Law, Allied's steps for recourse against Fireman's Fund were well plotted.

Any claimant who has a direct contractual relationship with any subcontractor of the prime contractor who gave such payment bond but has no contractual relationship, express or implied, with such prime contractor may bring an action on the payment bond only if he has given written notice to such contractor within 90 days from the date on which the claimant performed the last of the labor or furnished the last of the materials for which he claims payment, stating with substantial accuracy the amount claimed and the name of the person for whom the work was performed or to whom the material was furnished.

Public Works Contractor's Bond Law of 1967, 8 P.S. § 194(b).

■■■ Instead of adhering to its statutory remedy, Allied chose instead to first compromise and settle its debt with Smith, and then seek recovery for the same debt—materials supplied to Smith for the project—under the surety bond. Unfortunately, once the debt was extinguished, so were any rights that Allied had as a third-party beneficiary under the bond agreement.

Thus, while Allied may have had a right to bring a direct action against Fireman's Fund under the surety bond, that right only existed to the extent that Allied was owed money for materials which it had supplied to the Queen Lane Project. Once that debt ceased to exist, so did Allied's

rights as a third-party beneficiary. In other words, Fireman's Fund is entitled to raise, as a defense to Allied's claim, the fact that Allied has compromised and settled its debt with Smith. Not only has the debt been satisfied, but under the terms of the compromise agreement, all guarantors or sureties of the debt were released from liability. In pertinent part, the compromise agreement states:

> The undersigned creditor, [Allied], further agrees to accept the payment of twenty-five percent (25%) of the claim scheduled below in full satisfaction of the scheduled debt listed by Smith, and agrees that upon receipt of the final installment, creditor will release and discharge Smith, its officers, directors, agents, successors, assigns and any guarantors or sureties of Smith's debt.

By the terms of the compromise agreement, the debt owed to Allied, for materials supplied to the Queen Lane Project, was fully satisfied and discharged. Allied agreed to accept twenty-five cents on the dollar as full satisfaction of the debt. Thus, there no longer exists any debt for which Allied may seek recovery from Fireman's Fund. Fireman's Fund is entitled to raise this compromise and settlement of the debt as a complete defense to any action by Allied. *See Jewelcor Jewelers, supra.*

Finally, Allied attempts to circumvent the application of the compromise and settlement agreement by arguing that White undertook an independent obligation under the joint payment agreement which is enforceable by Allied against Fireman's Fund, as White's surety. As we have previously discussed in this opinion, Allied is estopped from asserting a claim against White under the joint payment agreement for the Queen Lane Project since Allied failed to protect its own interests under that arrangement. Since Allied is estopped from asserting such a claim against White, it is equally estopped from asserting one against White's surety, Fireman's Fund.

The judgment of the trial court in favor of appellees is affirmed as to all matters except that involving whether a final payment is due on the Divine Providence Project. As

to that issue, the case is remanded for the trial court's determination and entry of an appropriate order.

Judgment affirmed in part and reversed in part, and case remanded for proceedings consistent with the opinion.

Jurisdiction relinquished.