**GLEN–GERY CORPORATION,**
Appellant,

v.

**WARFEL CONSTRUCTION
COMPANY, Appellee.**

Superior Court of Pennsylvania.

Argued June 16, 1999.

Filed July 20, 1999.

Jonathan H. Rudd, Harrisburg, for appellant.

Thomas R. Davies, Lancaster, for appellee.

Before DEL SOLE and STEVENS, JJ., and CIRILLO, President Judge Emeritus.

CIRILLO, President Judge Emeritus:

¶ 1 Glen–Gery Corporation (Glen–Gery) appeals from the order entered in the Court of Common Pleas of Lancaster County, reducing to judgment a verdict in favor of Appellee, Warfel Construction Company (Warfel). We reverse and remand.

¶ 2 Warfel was hired as the general contractor by Manheim Township to construct the Nitrauer Elementary School (school project) in Lancaster, Pennsylvania. After soliciting bids from various subcontractors, Warfel chose Lawver Masonry (Lawver), as the unit masonry and architectural precast subcontractor on the project.[1] Lawver, in turn, hired Glen–Gery, a brick manufacturer, as its supplier of block and other specialized products for the project.

¶ 3 In February of 1990, Thomas Lawver, the owner of Lawver Masonry, met with Warfel to discuss Lawver's financial situation. Mr. Lawver explained that he was "broke" and that Warfel would have to pay for the materials for the school project and pay Lawver his labor expenses on a weekly basis. In response to Lawver's bleak financial position, Glen–Gery's corporate secretary, Craig Obeholtzer, sent a letter to Warfel's project manager, requesting that Warfel execute a joint payee check agreement. The agreement provided that Warfel would pay for all materials used by Lawver on a joint check basis; the check would be issued to both Lawver and Glen–Gery as payees. In essence, Glen–Gery would sell its materials to Lawver on credit and would then be compensated by Warfel for all amounts indicated on Glen–Gery's invoices. The standard Glen–Gery joint check form[2] used by the parties read as follows:

### JOINT PAYEE CHECK AGREEMENT FOR MATERIAL SUPPLY

The undersigned, Warfel Construction Company[,] located at 812 North Prince Street[,] Lancaster, PA 17604–4488 engaged in the construction of Nitrauer Elementary School Project, 811 Ashbourne Avenue[,] Lancaster, PA hereby agrees to issue joint payee checks made payable to Lawver Masonry, Box 325, Hanover, PA 17331 and[3] to the GLEN–GERY CORPORATION, P.O. BOX 8500 (S–9405), Philadelphia, PA 19178–9405, for all material purchased by Lawver Masonry for incorporation to said job mentioned above at 811 Ashborne Avenue, Lancaster, PA.

The joint check agreement was signed by Rupert H. Taylor (an officer of Warfel), agreed and acknowledged by Thomas Lawver, and witnessed by Paul Thorniey (Warfel's project manager) on May 23, 1990. In May of 1990, Lawver filed for bankruptcy.[4]

---

1. Lawver submitted a bid of $741,000.00 that was accepted by Warfel.

2. A Glen–Gery representative testified that his company had been using the standard form for over fifteen years prior to the present agreement with Lawver and Warfel. He estimated that his company had probably executed between seventy to one hundred such agreements per year since 1980.

3. Checks made payable to payees whose names are separated by the word "and" are joint payees, while those separated by the word "or" are considered alternative payees. *See* 21 U.Tol. L.Rev. 685, 712 (1990).

4. Mr. Lawver apprised Warfel of his company's bankruptcy filing. Moreover, the Warfel–Lawver contract for the school project contained a provision allowing Warfel to terminate and cancel its subcontract with Lawver upon Lawver becoming insolvent or filing a petition of bankruptcy.

¶ 4 After execution of the joint check agreement, Glen–Gery began submitting its invoices to Lawver, who would then send them with authorization to Warfel. When Warfel failed to promptly pay Glen–Gery for its materials, Thorniey sent Lawver a letter in July of 1990. Thorniey stated in his letter that Warfel would be escrowing approximately $45,000.00 to pay Glen–Gery's invoices, pending Lawver's authorization and approval to release the funds to Glen–Gery. On July 26, 1990, Warfel issued Lawver and Glen–Gery its first joint payee check in the amount of $42,743.70. A second check was issued to the same parties on September 25, 1990, in the amount of $17,898.61.

¶ 5 On October 26, 1990, a representative of Warfel met with Mr. Lawver to discuss the status of payment on the parties' contract. Warfel told Mr. Lawver he had exceeded his contract amount and that it would not pay his company any more money on the project. As a result, Lawver discontinued working on the school project. After being given this termination notice, Warfel requested that Lawver supply Warfel with information indicating what amounts were owed to Glen–Gery for its project supplies. A Warfel representative indicated at trial that the company did have some money still available at that time to pay suppliers on the school project. In fact, the record indicates that Warfel paid the balances of other suppliers' material invoices after Lawver left the project.[5] These suppliers had also executed joint check agreements with Warfel.

¶ 6 Warfel ultimately failed to pay Glen–Gery an alleged $62,000.00 in invoices. Warfel claimed that it was concerned that some of the materials supplied by Glen–Gery had not actually been used on the school project. As a result, the parties agreed to hire an independent esti-mator to determine the amount of material needed on the project compared to the material actually supplied by Glen–Gery. When a conflict arose with regard to the chosen estimator, the issue regarding the proper amount of money due Glen–Gery was never resolved. Accordingly, Glen–Gery was never paid for the material remaining at the school project site after Lawver left the project.

¶ 7 On May 4, 1994, Glen–Gery filed a complaint, which was later amended, against Warfel seeking to recover the amount of its unpaid invoices, together with interest. In the alternative to its contractual claim, Glen–Gery pled the legal theory of quantum meruit, claiming that Warfel had been unjustly enriched by accepting its materials without issuing payment. After a non-jury trial, a verdict was entered in favor of Warfel and against Glen–Gery on all of its claims. Glen–Gery filed timely post-trial motions; judgment was subsequently entered on the verdict due to the trial court's failure to rule upon the post-trial motions within 120 days of their filing. See Pa.R.C.P. 227.4(1)(b). On appeal, Glen–Gery presents one detailed issue for our review:

> Where a joint payee check agreement requires the general contractor to issue joint payee checks payable to the subcontractor and a material supplier for all materials purchased by the subcontractor for incorporation into the project and the materials purchased by the subcontractor are incorporated into the project, but the general contractor fails to issue joint payee checks for all of the materials supplied to the project, did the general contractor breach its contractual obligations to the material supplier and/or has the general contractor been unjustly enriched where the general contractor has received payment for all materials from the owner of the project?

---

5. The record indicates that Warfel issued a check to three of its other suppliers on the school project. Specifically, money was paid to: North American Industries in the amount of $25,861.00; to O.W. Ketcham, Inc. for $16,257.00; and to R.C. Savercool for $12,616.00.

¶ 8 Glen–Gery argues that the trial court improperly found that the issue in this case was whether Warfel was a "guarantor" of payment in the event that Lawver failed to make good in its payments to its suppliers such as Glen–Gery. Glen–Gery contends that the joint payee checking agreement clearly sets forth that Warfel directly obligated itself to make payment to Lawver's suppliers in the event Lawver was unable to make payments.

■ ¶ 9 As commonly used in the construction industry, a joint check arrangement provides that the general contractor will issue the progress payments to the subcontractor and its material suppliers. *City of Philadelphia v. Allied Roofers Supply Corp.*, 410 Pa.Super. 95, 599 A.2d 222 (1990). As noted by the court in *Allied Roofers*:

> Joint check arrangements may be initiated by parties at the top or bottom of the contract claim. For example, the general contractor may wish to insure that the party receiving the check (e.g., the subcontractor) will properly disburse the proceeds of the check to his supplier or subcontractors. In this manner the general contractor reduces the chances that his subcontractor will pocket the money and leave the supplier unpaid, thus provoking the supplier to file mechanic's liens or make claims against the general contractor's payment bond. Similarly, the supplier or sub-subcontractor may initiate the joint check arrangement to make sure that the subcontractor won't run off with the progress payments and leave him out in the cold. **The supplier may desire this arrangement because the subcontractor is in financial trouble or lacks assets,** or because he has never done business with the subcontractor before. Sometimes, the supplier will request a joint check arrangement out of simple mistrust of him.

*Id.* at 226 (citing Barrett, Joint Check Arrangements: A Release for the General Contractor and Its Surety, 8 Constr.Law 7 (1988)) (emphasis added). *See also Allied Building Prod. Corp. v. United Pacific Ins. Co.*, 77 Md.App. 220, 549 A.2d 1163, 1169 (1988) ("In order to induce a supplier to deal with a subcontractor whose credit is questionable, the general contractor may agree to pay the subcontractor with checks payable to the joint order of the subcontractor and the supplier. The subcontractor endorses the checks and turns them over to the supplier. The supplier then deducts the amount owed for materials, and returns the balance.") (citing **Cahn, Contractors' Payment Bonds in Maryland** at 259).

■ ¶ 10 In interpreting joint payee check agreements, "courts have relied upon the intent and language of the agreements as well as industry practice to determine the rights and liabilities of the parties." *Allied Roofers*, 599 A.2d at 226–27. When courts interpret a contractual agreement, their duty is to "ascertain the intent of the parties as manifested by the language of the written agreement." *Standard Venetian Blind Co. v. American Empire Insurance Co.*, 503 Pa. 300, 305, 469 A.2d 563, 566 (1983). *See Gianni v. Russel & Co., Inc.*, 281 Pa. 320, 323, 126 A. 791, 792 (1924) ("[w]here parties, without fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement."). This court will not rewrite the terms of a contract, nor give them a meaning that conflicts with that of the language used. *Sullivan v. Commonwealth*, 550 Pa. 639, 708 A.2d 481 (1998). The intent of the parties is to be ascertained from the document itself when the terms are clear and unambiguous. *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 519 A.2d 385 (1986).

■ ¶ 11 We must first determine whether the following language of the parties' joint check agreement is clear or ambiguous:

Warfel[,] ... engaged in the construction of Nitrauer Elementary School Project[,] ... agrees to issue joint payee checks made payable to Lawver Masonry ... and to the GLEN–GERY CORPORATION ... for all material purchased by Lawver Masonry for incorporation to said job mentioned above.

If we find the agreement's language clear and unambiguous, we need not look to extrinsic evidence, but may only determine the intent of the parties as expressed in the language of the joint check agreement. *Standard Venetian Blind, supra; Gianni, supra.* Moreover, we may look to industry practice as a guide in determining the rights and liabilities of the parties. *Allied Roofers, supra.*

¶ 12 With regard to the parties' intent as expressed in the agreement, the record indicates that the joint check agreement was executed due to the financial instability of Lawver; in essence, Glen–Gery was concerned that it would not be compensated by Lawver for the money it expended on all materials used for the school project. As noted by the court in *Allied Roofers, supra,* such a scenario is common practice in the construction industry where a supplier is concerned that a subcontractor is having financial problems or lack assets.

¶ 13 The agreement, itself, does not list a certain cap on the amount of money Warfel will pay the supplier for the school project materials, nor does it indicate that it will only pay Glen–Gery during the time that Lawver remains on the project. *Cf. United Pacific, supra* (where joint check agreement specifically stated that contractor did not assume liability for any materials purchased in excess of the total purchase of $100,000.00.). As the language of the agreement indicates, any supplies ordered by Glen–Gery for Lawver for the school project shall be paid by Warfel. In addition, the provisions of the Warfel–Lawver subcontract read in conjunction with the joint payee checking arrangement

clearly evidence an intent on the part of Warfel to compensate Glen–Gery as supplier for its project materials.

¶ 14 Specifically, the subcontract contains a provision stating that, when requested, Lawver would provide a complete list of all suppliers and all contractual, billing and payment information relating to those matters. The subcontract also provides that Lawver insure that all suppliers are "paid in amounts due in connection with the performance of this subcontract" and that "WARFEL CONSTRUCTION COMPANY may pay all persons which have not been paid the monies due them in connection with this subcontract." Moreover, the subcontract includes all the agreements between Warfel and Lawver for the school project and "any changes hereto shall be made in writing and executed by both WARFEL CONSTRUCTION COMPANY and the subcontractor [Lawver]." Consequently, we find that in executing the joint check arrangement, Warfel and Lawver agreed to change the standard subcontract provision providing that Lawver insure that all suppliers such as Glen–Gery be paid. In effect, this contract modification created a direct duty, rather than a right under the original subcontract, on Warfel's part to pay Glen–Gery for its project supplies. *See Allied Roofers, supra.*

¶ 15 At the parties' meeting on Friday, October 26, 1990, Warfel informed Lawver that it had exceeded its bid price and would no longer pay for any of its subcontracting work on the school project. The record indicates that not only was Glen–Gery unpaid for materials after Lawver left the school job, but various other school project suppliers were also due money for material expenses. In fact, these other suppliers were paid by Warfel for their provided materials. Most important, however, is the fact that these other suppliers had likewise entered into joint payee checking agreements with Warfel.

¶ 16 These facts indicate to us that the real reason Warfel did not compensate

Glen–Gery for its supplies was not because its payments had exceeded Lawver's contract bid.[6] Rather, the decision not to pay Glen–Gery rested on the fact that it was uncertain whether the invoiced supplies provided by Glen–Gery were actually used for the school project. In fact, Rupert H. Taylor, an officer of Warfel, testified at trial that this was the only concern that entered into Warfel's decision to not compensate Glen–Gery for its unpaid invoices.

¶ 17 Based upon the testimony at trial and the clear language and intent of the joint check arrangement, we must reverse and remand. The parties' joint payee check agreement was a measure purposefully intended to create additional security for a materials supplier of a soon-to-be bankrupt/insolvent subcontractor. *See Allied Building Prod. Corp. v. United Pacific Insurance Co.*, 77 Md.App. 220, 549 A.2d 1163, 1168 (Md.App.1988) (where parties entered into joint check agreement because supplier was concerned about that subcontractor was a poor credit risk, "[t]he joint check agreement, itself, and the circumstances prompting its creation, indicates that it was intended to create additional security for [the supplier]."). The agreement consisted of Warfel's promise to issue joint checks in exchange for all school project material purchased by Lawver from Glen–Gery. This payment arrangement was requested by Glen–Gery, a material supplier on the job, due to Lawver's financial instability. The parties clearly had a "deal" which they all considered an advantageous exchange: Warfel would have the necessary services and materials for the school project; Lawver would be paid for its labor and would not be concerned about insufficient funds to pay its supplier (Glen–Gery); and Glen–Gery would be assured of receiving payment for the supplies it ordered for the

project. *See United Electric Corp. v. All Service Electric, Inc.*, 256 N.W.2d 92 (Minn.1977).

¶ 18 In its Pa.R.A.P.1925(a) opinion, the court states that because Glen–Gery was the author of the joint check agreement that the parties signed, any ambiguities of such agreement should be construed against it. Furthermore, the court finds that the agreement was merely a mechanism of payment between the project contractor (Warfel), subcontractor (Lawver) and material supplier (Glen–Gery). Accordingly, it did not believe that the agreement was intended to set Warfel up as the guarantor of payment to Glen–Gery for its school project supplies. Specifically, it believed that Warfel had no obligation to pay more money to anyone than what it owed to Lawver under its $741,000.00 contract bid.

¶ 19 The trial court has misapplied the law of contracts. It is only where a contract or document has been found to contain ambiguities, that we then look to extrinsic evidence to determine the intent of the parties and may **then** construe the contract against it drafter. *Standard Venetian Blind, supra; Gianni, supra.* The trial court, however, never made a finding that the agreement was ambiguous or subject to differing interpretations. Moreover, we do not find ambiguity in the parties' joint check agreement. The language of the agreement is clear that Warfel intended to pay Glen–Gery for all materials it supplied to Lawver for use in the school project. Accordingly, we find it neither necessary nor proper to interpret the agreement against Glen–Gery as drafter. Finally, Warfel conceded that the only reason it failed to pay Glen–Gery was because it was not certain that the unpaid

---

6. In a related argument, Warfel asserts that because Glen–Gery is considered a third-party beneficiary to the Warfel–Lawver contract, Glen–Gery's rights "may rise no higher than the rights of the parties to the contract (i.e., Lawver)." *Allied, supra* at 229. As a result,

Warfel contends that Glen–Gery is limited in collecting money up to the bidding price on the parties' contract. Because this limit was surpassed, there is no money to be recovered. As we have stated, we do not find this argument persuasive.

materials had actually been used on the school project.

¶ 20   Having found the language of the agreement clear and unambiguous, we give effect to its language by reversing the trial court's verdict in favor of Warfel. Both parties on appeal have acknowledged that Glen–Gery has unpaid invoices for material it allegedly supplied to Warfel for its school project. Because Warfel has only agreed to issue joint payee checks all material purchased by Lawver Masonry for incorporation to said job, we must remand for a determination as to: (1) whether the material indicated in the invoices was purchased by Lawver, and, if so, (2) whether Lawver purchased the material for incorporation in the school project. If both questions are answered in the affirmative, then the trial court shall award Glen–Gery the amount of such unpaid expenses, with interest due and owing to date. If the court finds that the materials supplied were not purchased by Lawver for use in the school project, then a verdict shall be rendered in favor of Warfel.

¶ 21   We reverse and remand for proceedings consistent with this decision. Jurisdiction relinquished.